# FLORIDA *v.* RILEY

No. 87–764.   Argued October 3, 1988—Decided January 23, 1989

*Parker D. Thomson*, Special Assistant Attorney General of Florida, argued the cause for petitioner. With him on the briefs were *Robert A. Butterworth*, Attorney General,

*Candace M. Sunderland* and *Peggy A. Quince*, Assistant Attorneys General, and *Cloyce L. Mangas, Jr.*, Special Assistant Attorney General.

*Marc H. Salton* argued the cause and filed a brief for respondent.*

JUSTICE WHITE announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE KENNEDY join.

On certification to it by a lower state court, the Florida Supreme Court addressed the following question: "Whether surveillance of the interior of a partially covered greenhouse

---

*Briefs of *amici curiae* urging reversal were filed for the State of Indiana et al. by *Linley E. Pearson*, Attorney General of Indiana, and *Lisa M. Paunicka*, Deputy Attorney General, *Don Siegelman*, Attorney General of Alabama, *Robert K. Corbin*, Attorney General of Arizona, *John Steven Clark*, Attorney General of Arkansas, *John J. Kelly*, Chief State's Attorney of Connecticut, *Charles M. Oberly*, Attorney General of Delaware, *Warren Price III*, Attorney General of Hawaii, *Jim Jones*, Attorney General of Idaho, *Neil F. Hartigan*, Attorney General of Illinois, *Robert T. Stephan*, Attorney General of Kansas, *Frederic J. Cowan*, Attorney General of Kentucky, *Frank J. Kelley*, Attorney General of Michigan, *Hubert H. Humphrey III*, Attorney General of Minnesota, *William L. Webster*, Attorney General of Missouri, *Robert M. Spire*, Attorney General of Nebraska, *Lacy H. Thornburg*, Attorney General of North Carolina, *Anthony J. Celebrezze, Jr.*, Attorney General of Ohio, *Dave Frohnmayer*, Attorney General of Oregon, *Travis Medlock*, Attorney General of South Carolina, *Roger A. Tellinghuisen*, Attorney General of South Dakota, *David L. Wilkinson*, Attorney General of Utah, *Jeffrey Amestoy*, Attorney General of Vermont, *Don Hanaway*, Attorney General of Wisconsin, and *Joseph B. Meyer*, Attorney General of Wyoming; and for the Airborne Law Enforcement Association, Inc., by *Ellen M. Condon* and *Paul J. Marino*.

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Kent L. Richland, Pamela Victorine, John A. Powell, Steve R. Shapiro, Paul Hoffman, Joan W. Howarth*, and *James K. Green;* for Community Outreach to Vietnam Era Returnees, Inc., by *Deborah C. Wyatt;* and for the National Association of Criminal Defense Lawyers by *Milton Hirsch*.

*Ronald M. Sinoway* filed a brief for the California Attorneys for Criminal Justice et al. as *amici curiae*.

in a residential backyard from the vantage point of a helicopter located 400 feet above the greenhouse constitutes a 'search' for which a warrant is required under the Fourth Amendment and Article I, § 12 of the Florida Constitution." 511 So. 2d 282 (1987). The court answered the question in the affirmative, and we granted the State's petition for certiorari challenging that conclusion. 484 U. S. 1058 (1988).[1]

Respondent Riley lived in a mobile home located on five acres of rural property. A greenhouse was located 10 to 20 feet behind the mobile home. Two sides of the greenhouse were enclosed. The other two sides were not enclosed but the contents of the greenhouse were obscured from view from surrounding property by trees, shrubs, and the mobile home. The greenhouse was covered by corrugated roofing panels, some translucent and some opaque. At the time relevant to this case, two of the panels, amounting to approximately 10% of the roof area, were missing. A wire fence surrounded the mobile home and the greenhouse, and the property was posted with a "DO NOT ENTER" sign.

This case originated with an anonymous tip to the Pasco County Sheriff's office that marijuana was being grown on respondent's property. When an investigating officer discovered that he could not see the contents of the greenhouse from the road, he circled twice over respondent's property in a helicopter at the height of 400 feet. With his naked eye, he was able to see through the openings in the roof and one or more of the open sides of the greenhouse and to identify what he thought was marijuana growing in the structure. A war-

---

[1] The Florida Supreme Court mentioned the State Constitution in posing the question, once in the course of its opinion, and again in finally concluding that the search violated the Fourth Amendment and the State Constitution. The bulk of the discussion, however, focused exclusively on federal cases dealing with the Fourth Amendment, and there being no indication that the decision "clearly and expressly . . . is alternatively based on bona fide separate, adequate, and independent grounds," we have jurisdiction. *Michigan* v. *Long*, 463 U. S. 1032, 1041 (1983).

rant was obtained based on these observations, and the ensuing search revealed marijuana growing in the greenhouse. Respondent was charged with possession of marijuana under Florida law.   The trial court granted his motion to suppress; the Florida Court of Appeals reversed but certified the case to the Florida Supreme Court, which quashed the decision of the Court of Appeals and reinstated the trial court's suppression order.

We agree with the State's submission that our decision in *California* v. *Ciraolo*, 476 U. S. 207 (1986), controls this case.   There, acting on a tip, the police inspected the backyard of a particular house while flying in a fixed-wing aircraft at 1,000 feet.   With the naked eye the officers saw what they concluded was marijuana growing in the yard.   A search warrant was obtained on the strength of this airborne inspection, and marijuana plants were found.   The trial court refused to suppress this evidence, but a state appellate court held that the inspection violated the Fourth and Fourteenth Amendments to the United States Constitution, and that the warrant was therefore invalid.   We in turn reversed, holding that the inspection was not a search subject to the Fourth Amendment.   We recognized that the yard was within the curtilage of the house, that a fence shielded the yard from observation from the street, and that the occupant had a subjective expectation of privacy.   We held, however, that such an expectation was not reasonable and not one "that society is prepared to honor."   *Id.*, at 214.   Our reasoning was that the home and its curtilage are not necessarily protected from inspection that involves no physical invasion.   " 'What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.'" *Id.*, at 213, quoting *Katz* v. *United States*, 389 U. S. 347, 351 (1967).   As a general proposition, the police may see what may be seen "from a public vantage point where [they have] a right to be," 476 U. S., at 213.   Thus the police, like the public, would have been free to inspect the backyard garden from

the street if their view had been unobstructed. They were likewise free to inspect the yard from the vantage point of an aircraft flying in the navigable airspace as this plane was. "In an age where private and commercial flight in the public airways is routine, it is unreasonable for respondent to expect that his marijuana plants were constitutionally protected from being observed with the naked eye from an altitude of 1,000 feet. The Fourth Amendment simply does not require the police traveling in the public airways at this altitude to obtain a warrant in order to observe what is visible to the naked eye." *Id.*, at 215.

We arrive at the same conclusion in the present case. In this case, as in *Ciraolo*, the property surveyed was within the curtilage of respondent's home. Riley no doubt intended and expected that his greenhouse would not be open to public inspection, and the precautions he took protected against ground-level observation. Because the sides and roof of his greenhouse were left partially open, however, what was growing in the greenhouse was subject to viewing from the air. Under the holding in *Ciraolo*, Riley could not reasonably have expected the contents of his greenhouse to be immune from examination by an officer seated in a fixed-wing aircraft flying in navigable airspace at an altitude of 1,000 feet or, as the Florida Supreme Court seemed to recognize, at an altitude of 500 feet, the lower limit of the navigable airspace for such an aircraft. 511 So. 2d, at 288. Here, the inspection was made from a helicopter, but as is the case with fixed-wing planes, "private and commercial flight [by helicopter] in the public airways is routine" in this country, *Ciraolo, supra*, at 215, and there is no indication that such flights are unheard of in Pasco County, Florida.[2] Riley could not rea-

---

[2] The first use of the helicopter by police was in New York in 1947, and today every State in the country uses helicopters in police work. As of 1980, there were 1,500 such aircraft used in police work. E. Brown, The Helicopter in Civil Operations 79 (1981). More than 10,000 helicopters, both public and private, are registered in the United States. Federal Avi-

sonably have expected that his greenhouse was protected from public or official observation from a helicopter had it been flying within the navigable airspace for fixed-wing aircraft.

Nor on the facts before us, does it make a difference for Fourth Amendment purposes that the helicopter was flying at 400 feet when the officer saw what was growing in the greenhouse through the partially open roof and sides of the structure. We would have a different case if flying at that altitude had been contrary to law or regulation. But helicopters are not bound by the lower limits of the navigable airspace allowed to other aircraft.[3] Any member of the public could legally have been flying over Riley's property in a helicopter at the altitude of 400 feet and could have observed Riley's greenhouse. The police officer did no more. This is not to say that an inspection of the curtilage of a house from an aircraft will always pass muster under the Fourth Amendment simply because the plane is within the navigable airspace specified by law. But it is of obvious importance that the helicopter in this case was *not* violating the law, and there is nothing in the record or before us to suggest that helicopters flying at 400 feet are sufficiently rare in this country to lend substance to respondent's claim that he reasonably anticipated that his greenhouse would not be subject to

---

ation Administration, Census of U. S. Civil Aircraft, Calendar Year 1987, p. 12. See also 1988 Helicopter Annual 9. And there are an estimated 31,697 helicopter pilots. Federal Aviation Administration, Statistical Handbook of Aviation, Calendar Year 1986, p. 147.

[3] While Federal Aviation Administration regulations permit fixed-wing aircraft to be operated at an altitude of 1,000 feet while flying over congested areas and at an altitude of 500 feet above the surface in other than congested areas, helicopters may be operated at less than the minimums for fixed-wing aircraft "if the operation is conducted without hazard to persons or property on the surface. In addition, each person operating a helicopter shall comply with routes or altitudes specifically prescribed for helicopters by the [FAA] Administrator." 14 CFR § 91.79 (1988).

observation from that altitude. Neither is there any intimation here that the helicopter interfered with respondent's normal use of the greenhouse or of other parts of the curtilage. As far as this record reveals, no intimate details connected with the use of the home or curtilage were observed, and there was no undue noise, and no wind, dust, or threat of injury. In these circumstances, there was no violation of the Fourth Amendment.

The judgment of the Florida Supreme Court is accordingly reversed.

*So ordered.*

JUSTICE O'CONNOR, concurring in the judgment.

I concur in the judgment reversing the Supreme Court of Florida because I agree that police observation of the greenhouse in Riley's curtilage from a helicopter passing at an altitude of 400 feet did not violate an expectation of privacy "that society is prepared to recognize as 'reasonable.'" *Katz* v. *United States*, 389 U. S. 347, 361 (1967) (Harlan, J., concurring). I write separately, however, to clarify the standard I believe follows from *California* v. *Ciraolo*, 476 U. S. 207 (1986). In my view, the plurality's approach rests the scope of Fourth Amendment protection too heavily on compliance with FAA regulations whose purpose is to promote air safety, not to protect "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U. S. Const., Amdt. 4.

*Ciraolo* involved observation of curtilage by officers flying in an airplane at an altitude of 1,000 feet. In evaluating whether this observation constituted a search for which a warrant was required, we acknowledged the importance of curtilage in Fourth Amendment doctrine: "The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." 476 U. S., at 212–213. Although the curtilage is an area to which the private activi-

ties of the home extend, all police observation of the curtilage is not necessarily barred by the Fourth Amendment. As we observed: "The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares." *Id.*, at 213. In *Ciraolo*, we likened observation from a plane traveling in "public navigable airspace" at 1,000 feet to observation by police "passing by a home on public thoroughfares." We held that "[i]n an age where private and commercial flight in the public airways is routine," it is unreasonable to expect the curtilage to be constitutionally protected from aerial observation with the naked eye from an altitude of 1,000 feet. *Id.*, at 215.

Ciraolo's expectation of privacy was unreasonable not because the airplane was operating where it had a "right to be," but because public air travel at 1,000 feet is a sufficiently routine part of modern life that it is unreasonable for persons on the ground to expect that their curtilage will not be observed from the air at that altitude. Although "helicopters are not bound by the lower limits of the navigable airspace allowed to other aircraft," *ante*, at 451, there is no reason to assume that compliance with FAA regulations alone determines " 'whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment.' " *Ciraolo, supra*, at 212 (quoting *Oliver* v. *United States*, 466 U. S. 170, 182–183 (1984)). Because the FAA has decided that helicopters can lawfully operate at virtually any altitude so long as they pose no safety hazard, it does not follow that the expectations of privacy "society is prepared to recognize as 'reasonable' " simply mirror the FAA's safety concerns.

Observations of curtilage from helicopters at very low altitudes are not perfectly analogous to ground-level observations from public roads or sidewalks. While in both cases the police may have a legal right to occupy the physical space from which their observations are made, the two situations

are not necessarily comparable in terms of whether expectations of privacy from such vantage points should be considered reasonable. Public roads, even those less traveled by, are clearly demarked public thoroughfares. Individuals who seek privacy can take precautions, tailored to the location of the road, to avoid disclosing private activities to those who pass by. They can build a tall fence, for example, and thus ensure private enjoyment of the curtilage without risking public observation from the road or sidewalk. If they do not take such precautions, they cannot reasonably expect privacy from public observation. In contrast, even individuals who have taken effective precautions to ensure against ground-level observations cannot block off all conceivable aerial views of their outdoor patios and yards without entirely giving up their enjoyment of those areas. To require individuals to completely cover and enclose their curtilage is to demand more than the "precautions customarily taken by those seeking privacy." *Rakas* v. *Illinois*, 439 U. S. 128, 152 (1978) (Powell, J., concurring). The fact that a helicopter could conceivably observe the curtilage at virtually any altitude or angle, without violating FAA regulations, does not in itself mean that an individual has no reasonable expectation of privacy from such observation.

In determining whether Riley had a reasonable expectation of privacy from aerial observation, the relevant inquiry after *Ciraolo* is not whether the helicopter was where it had a right to be under FAA regulations. Rather, consistent with *Katz*, we must ask whether the helicopter was in the public airways at an altitude at which members of the public travel with sufficient regularity that Riley's expectation of privacy from aerial observation was not "one that society is prepared to recognize as 'reasonable.'" *Katz, supra*, at 361. Thus, in determining "'whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment,'" *Ciraolo, supra*, at 212 (quoting *Oliver, supra*, at 182–183), it is not conclusive to observe,

as the plurality does, that "[a]ny member of the public could legally have been flying over Riley's property in a helicopter at the altitude of 400 feet and could have observed Riley's greenhouse." *Ante*, at 451. Nor is it conclusive that police helicopters may often fly at 400 feet. If the public rarely, if ever, travels overhead at such altitudes, the observation cannot be said to be from a vantage point generally used by the public and Riley cannot be said to have "knowingly expose[d]" his greenhouse to public view. However, if the public can generally be expected to travel over residential backyards at an altitude of 400 feet, Riley cannot reasonably expect his curtilage to be free from such aerial observation.

In my view, the defendant must bear the burden of proving that his expectation of privacy was a reasonable one, and thus that a "search" within the meaning of the Fourth Amendment even took place. Cf. *Jones* v. *United States*, 362 U. S. 257, 261 (1960) ("Ordinarily, then, it is entirely proper to require of one who seeks to challenge the legality of a search as the basis for suppressing relevant evidence that he allege, and if the allegation be disputed that he establish, that he himself was the victim of an invasion of privacy"); *Nardone* v. *United States*, 308 U. S. 338, 341 (1939).

Because there is reason to believe that there is considerable public use of airspace at altitudes of 400 feet and above, and because Riley introduced no evidence to the contrary before the Florida courts, I conclude that Riley's expectation that his curtilage was protected from naked-eye aerial observation from that altitude was not a reasonable one. However, public use of altitudes lower than that—particularly public observations from helicopters circling over the curtilage of a home—may be sufficiently rare that police surveillance from such altitudes would violate reasonable expectations of privacy, despite compliance with FAA air safety regulations.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE STEVENS join, dissenting.

The Court holds today that police officers need not obtain a warrant based on probable cause before circling in a helicopter 400 feet above a home in order to investigate what is taking place behind the walls of the curtilage. I cannot agree that the Fourth Amendment to the Constitution, which safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," tolerates such an intrusion on privacy and personal security.

## I

The opinion for a plurality of the Court reads almost as if *Katz* v. *United States,* 389 U. S. 347 (1967), had never been decided. Notwithstanding the disclaimers of its final paragraph, the opinion relies almost exclusively on the fact that the police officer conducted his surveillance from a vantage point where, under applicable Federal Aviation Administration regulations, he had a legal right to be. *Katz* teaches, however, that the relevant inquiry is whether the police surveillance "violated the privacy upon which [the defendant] justifiably relied," *id.,* at 353—or, as Justice Harlan put it, whether the police violated an "expectation of privacy . . . that society is prepared to recognize as 'reasonable.'" *Id.,* at 361 (concurring opinion). The result of that inquiry in any given case depends ultimately on the judgment "whether, if the particular form of surveillance practiced by the police is permitted to go unregulated by constitutional restraints, the amount of privacy and freedom remaining to citizens would be diminished to a compass inconsistent with the aims of a free and open society." Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 403 (1974); see also 1 W. LaFave, Search and Seizure § 2.1(d), pp. 310–314 (2d ed. 1987).

The plurality undertakes no inquiry into whether low-level helicopter surveillance by the police of activities in an en-

closed backyard is consistent with the "aims of a free and open society." Instead, it summarily concludes that Riley's expectation of privacy was unreasonable because "[a]ny member of the public could legally have been flying over Riley's property in a helicopter at the altitude of 400 feet and could have observed Riley's greenhouse." *Ante*, at 451. This observation is, in turn, based solely on the fact that the police helicopter was within the airspace within which such craft are allowed by federal safety regulations to fly.

I agree, of course, that "[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." *Katz*, *supra*, at 351. But I cannot agree that one "knowingly exposes [an area] to the public" solely because a helicopter may legally fly above it. Under the plurality's exceedingly grudging Fourth Amendment theory, the expectation of privacy is defeated if a single member of the public could conceivably position herself to see into the area in question without doing anything illegal. It is defeated whatever the difficulty a person would have in so positioning herself, and however infrequently anyone would in fact do so. In taking this view the plurality ignores the very essence of *Katz*. The reason why there is no reasonable expectation of privacy in an area that is exposed to the public is that little diminution in "the amount of privacy and freedom remaining to citizens" will result from police surveillance of something that any passerby readily sees. To pretend, as the plurality opinion does, that the same is true when the police use a helicopter to peer over high fences is, at best, disingenuous. Notwithstanding the plurality's statistics about the number of helicopters registered in this country, can it seriously be questioned that Riley enjoyed virtually complete privacy in his backyard greenhouse, and that that privacy was invaded solely by police helicopter surveillance? Is the theoretical possibility that any member of the public (with sufficient means) could also have hired a helicopter and looked over Riley's fence of any relevance at all in determin-

ing whether Riley suffered a serious loss of privacy and personal security through the police action?

In *California* v. *Ciraolo*, 476 U. S. 207 (1986), we held that whatever might be observed from the window of an airplane flying at 1,000 feet could be deemed unprotected by any reasonable expectation of privacy. That decision was based on the belief that airplane traffic at that altitude was sufficiently common that no expectation of privacy could inure in·anything on the ground observable with the naked eye from so high. Indeed, we compared those airways to "public thoroughfares," and made the obvious point that police officers passing by a home on such thoroughfares were not required by the Fourth Amendment to "shield their eyes." *Id.*, at 213. Seizing on a reference in *Ciraolo* to the fact that the police officer was in a position "where he ha[d] a right to be," *ibid.*, today's plurality professes to find this case indistinguishable because FAA regulations do not impose a minimum altitude requirement on helicopter traffic; thus, the officer in this case too made his observations from a vantage point where he had a right to be.[1]

It is a curious notion that the reach of the Fourth Amendment can be so largely defined by administrative regulations issued for purposes of flight safety.[2] It is more curious still

---

[1] What the plurality now states as a firm rule of Fourth Amendment jurisprudence appeared in *Ciraolo*, 476 U. S., at 213, as a passing comment: "Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible. *E. g.*, *United States* v. *Knotts*, 460 U. S. 276, 282 (1983)." This rule for determining the constitutionality of aerial surveillance thus derives ultimately from *Knotts*, a case in which the police officers' feet were firmly planted on the ground. What is remarkable is not that one case builds on another, of course, but rather that a principle based on terrestrial observation was applied to airborne surveillance without any consideration whether that made a difference.

[2] The plurality's use of the FAA regulations as a means for determining whether Riley enjoyed a reasonable expectation of privacy produces an incredible result. Fixed-wing aircraft may not be operated below 500 feet

that the plurality relies to such an extent on the legality of the officer's act, when we have consistently refused to equate police violation of the law with infringement of the Fourth Amendment.[3] But the plurality's willingness to end its inquiry when it finds that the officer was in a position he had a right to be in is misguided for an even more fundamental reason. Finding determinative the fact that the officer was where he had a right to be is, at bottom, an attempt to analogize surveillance from a helicopter to surveillance by a police officer standing on a public road and viewing evidence of crime through an open window or a gap in a fence. In such a situation, the occupant of the home may be said to lack any

---

(1,000 feet over congested areas), while helicopters may be operated below those levels. See *ante*, at 451, n. 3. Therefore, whether Riley's expectation of privacy is reasonable turns on whether the police officer at 400 feet above his curtilage is seated in an airplane or a helicopter. This cannot be the law.

[3] In *Oliver* v. *United States*, 466 U. S. 170 (1984), for example, we held that police officers who trespassed upon posted and fenced private land did not violate the Fourth Amendment, despite the fact that their action was subject to criminal sanctions. We noted that the interests vindicated by the Fourth Amendment were not identical with those served by the common law of trespass. See *id.*, at 183–184, and n. 15; see also *Hester* v. *United States*, 265 U. S. 57 (1924) (trespass in "open fields" does not violate the Fourth Amendment). In *Olmstead* v. *United States*, 277 U. S. 438, 466–469 (1928), the illegality under state law of a wiretap that yielded the disputed evidence was deemed irrelevant to its admissibility. And of course *Katz* v. *United States*, 389 U. S. 347 (1967), which overruled *Olmstead*, made plain that the question whether or not the disputed evidence had been procured by means of a trespass was irrelevant. Recently, in *Dow Chemical Co.* v. *United States*, 476 U. S. 227, 239, n. 6 (1986), we declined to consider trade-secret laws indicative of a reasonable expectation of privacy. Our precedent thus points not toward the position adopted by the plurality opinion, but rather toward the view on this matter expressed some years ago by the Oregon Court of Appeals: "We . . . find little attraction in the idea of using FAA regulations because they were not formulated for the purpose of defining the reasonableness of citizens' expectations of privacy. They were designed to promote air safety." *State* v. *Davis*, 51 Ore. App. 827, 831, 627 P. 2d 492, 494 (1981).

reasonable expectation of privacy in what can be seen from that road—even if, in fact, people rarely pass that way.

The police officer positioned 400 feet above Riley's backyard was not, however, standing on a public road. The vantage point he enjoyed was not one any citizen could readily share. His ability to see over Riley's fence depended on his use of a very expensive and sophisticated piece of machinery to which few ordinary citizens have access. In such circumstances it makes no more sense to rely on the legality of the officer's position in the skies than it would to judge the constitutionality of the wiretap in *Katz* by the legality of the officer's position outside the telephone booth. The simple inquiry whether the police officer had the legal right to be in the position from which he made his observations cannot suffice, for we cannot assume that Riley's curtilage was so open to the observations of passersby in the skies that he retained little privacy or personal security to be lost to police surveillance. The question before us must be not whether the police were where they had a right to be, but whether public observation of Riley's curtilage was so commonplace that Riley's expectation of privacy in his backyard could not be considered reasonable. To say that an invasion of Riley's privacy from the skies was not impossible is most emphatically not the same as saying that his expectation of privacy within his enclosed curtilage was not "one that society is prepared to recognize as 'reasonable.'" *Katz*, 389 U. S., at 361 (Harlan, J., concurring).[4] While, as we held in *Ciraolo*, air traffic at elevations of 1,000 feet or more may be so common that whatever could be seen with the naked eye from that elevation is unprotected by the Fourth Amendment, it is a large step from there to say that the Amendment offers no protection against low-level helicopter surveillance of enclosed curtilage

---

[4] Cf. *California* v. *Greenwood*, 486 U. S. 35, 54 (1988) (BRENNAN, J., dissenting) ("The mere *possibility* that unwelcome meddlers *might* open and rummage through the containers does not negate the expectation of privacy in their contents . . .").

areas. To take this step is error enough. That the plurality does so with little analysis beyond its determination that the police complied with FAA regulations is particularly unfortunate.

## II

Equally disconcerting is the lack of any meaningful limit to the plurality's holding. It is worth reiterating that the FAA regulations the plurality relies on as establishing that the officer was where he had a right to be set no minimum flight altitude for helicopters. It is difficult, therefore, to see what, if any, helicopter surveillance would run afoul of the plurality's rule that there exists no reasonable expectation of privacy as long as the helicopter is where it has a right to be.

Only in its final paragraph does the plurality opinion suggest that there might be some limits to police helicopter surveillance beyond those imposed by FAA regulations:

> "Neither is there any intimation here that the helicopter interfered with respondent's normal use of the greenhouse or of other parts of the curtilage. As far as this record reveals, no intimate details connected with the use of the home or curtilage were observed, and there was no undue noise, and no wind, dust, or threat of injury. In these circumstances, there was no violation of the Fourth Amendment." *Ante,* at 452.[5]

I will deal with the "intimate details" below. For the rest, one wonders what the plurality believes the purpose of the Fourth Amendment to be. If through noise, wind, dust, and threat of injury from helicopters the State "interfered with respondent's normal use of the greenhouse or of other parts

[5] Without actually stating that it makes any difference, the plurality also notes that "there is nothing in the record or before us to suggest" that helicopter traffic at the 400-foot level is so rare as to justify Riley's expectation of privacy. *Ante,* at 451. The absence of anything "in the record or before us" to suggest the opposite, however, seems not to give the plurality pause. It appears, therefore, that it is the FAA regulations rather than any empirical inquiry that is determinative.

of the curtilage," Riley might have a cause of action in inverse condemnation, but that is not what the Fourth Amendment is all about. Nowhere is this better stated than in JUSTICE WHITE'S opinion for the Court in *Camara v. Municipal Court*, 387 U. S. 523, 528 (1967): "The basic purpose of this Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." See also *Marshall v. Barlow's, Inc.*, 436 U. S. 307, 312 (1978) (same); *Schmerber v. California*, 384 U. S. 757, 767 (1966) ("The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State"); *Wolf v. Colorado*, 338 U. S. 25, 27 (1949) ("The security of one's privacy against arbitrary intrusion by the police . . . is at the core of the Fourth Amendment . . ."), overruled on other grounds, *Mapp v. Ohio*, 367 U. S. 643 (1961); *Boyd v. United States*, 116 U. S. 616, 630 (1886) ("It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal security . . .").

If indeed the purpose of the restraints imposed by the Fourth Amendment is to "safeguard the privacy and security of individuals," then it is puzzling why it should be the helicopter's noise, wind, and dust that provides the measure of whether this constitutional safeguard has been infringed. Imagine a helicopter capable of hovering just above an enclosed courtyard or patio without generating any noise, wind, or dust at all—and, for good measure, without posing any threat of injury. Suppose the police employed this miraculous tool to discover not only what crops people were growing in their greenhouses, but also what books they were reading and who their dinner guests were. Suppose, finally, that the FAA regulations remained unchanged, so that the police were undeniably "where they had a right to be." Would to-

day's plurality continue to assert that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" was not infringed by such surveillance? Yet that is the logical consequence of the plurality's rule that, so long as the police are where they have a right to be under air traffic regulations, the Fourth Amendment is offended only if the aerial surveillance interferes with the use of the backyard as a garden spot. Nor is there anything in the plurality's opinion to suggest that any different rule would apply were the police looking from their helicopter, not into the open curtilage, but through an open window into a room viewable only from the air.

## III

Perhaps the most remarkable passage in the plurality opinion is its suggestion that the case might be a different one had any "intimate details connected with the use of the home or curtilage [been] observed." *Ante*, at 452. What, one wonders, is meant by "intimate details"? If the police had observed Riley embracing his wife in the backyard greenhouse, would we then say that his reasonable expectation of privacy had been infringed? Where in the Fourth Amendment or in our cases is there any warrant for imposing a requirement that the activity observed must be "intimate" in order to be protected by the Constitution?

It is difficult to avoid the conclusion that the plurality has allowed its analysis of Riley's expectation of privacy to be colored by its distaste for the activity in which he was engaged. It is indeed easy to forget, especially in view of current concern over drug trafficking, that the scope of the Fourth Amendment's protection does not turn on whether the activity disclosed by a search is illegal or innocuous. But we dismiss this as a "drug case" only at the peril of our own liberties. Justice Frankfurter once noted that "[i]t is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very

nice people," *United States* v. *Rabinowitz*, 339 U. S. 56, 69 (1950) (dissenting opinion), and nowhere is this observation more apt than in the area of the Fourth Amendment, whose words have necessarily been given meaning largely through decisions suppressing evidence of criminal activity. The principle enunciated in this case determines what limits the Fourth Amendment imposes on aerial surveillance of any person, for any reason. If the Constitution does not protect Riley's marijuana garden against such surveillance, it is hard to see how it will prohibit the government from aerial spying on the activities of a law-abiding citizen on her fully enclosed outdoor patio. As Professor Amsterdam has eloquently written: "The question is not whether you or I must draw the blinds before we commit a crime. It is whether you and I must discipline ourselves to draw the blinds every time we enter a room, under pain of surveillance if we do not." 58 Minn. L. Rev., at 403.[6]

## IV

I find little to disagree with in JUSTICE O'CONNOR's concurrence, apart from its closing paragraphs. A majority of the Court thus agrees that the fundamental inquiry is not whether the police were where they had a right to be under FAA regulations, but rather whether Riley's expectation of privacy was rendered illusory by the extent of

---

[6] See also *United States* v. *White*, 401 U. S. 745, 789–790 (1971) (Harlan, J., dissenting):

"By casting its 'risk analysis' solely in terms of the expectations and risks that 'wrongdoers' or 'one contemplating illegal activities' ought to bear, the plurality opinion, I think, misses the mark entirely. . . . The interest [protected by the Fourth Amendment] is the expectation of the ordinary citizen, who has never engaged in illegal conduct in his life, that he may carry on his private discourse freely, openly, and spontaneously . . . . Interposition of a warrant requirement is designed not to shield 'wrongdoers,' but to secure a measure of privacy and a sense of personal security throughout our society."

public observation of his backyard from aerial traffic at 400 feet.

What separates me from JUSTICE O'CONNOR is essentially an empirical matter concerning the extent of public use of the airspace at that altitude, together with the question of how to resolve that issue. I do not think the constitutional claim should fail simply because "there is reason to believe" that there is "considerable" public flying this close to earth or because Riley "introduced no evidence to the contrary before the Florida courts." *Ante*, at 455 (O'CONNOR, J., concurring in judgment). I should think that this might be an apt occasion for the application of Professor Davis' distinction between "adjudicative" and "legislative" facts. See Davis, An Approach to Problems of Evidence in the Administrative Process, 55 Harv. L. Rev. 364, 402–410 (1942); see also Advisory Committee's Notes on Fed. Rule Evid. 201, 28 U. S. C. App., pp. 683–684. If so, I think we could take judicial notice that, while there may be an occasional privately owned helicopter that flies over populated areas at an altitude of 400 feet, such flights are a rarity and are almost entirely limited to approaching or leaving airports or to reporting traffic congestion near major roadways. And, as the concurrence agrees, *ante*, at 455, the extent of police surveillance traffic cannot serve as a bootstrap to demonstrate public use of the airspace.

If, however, we are to resolve the issue by considering whether the appropriate party carried its burden of proof, I again think that Riley must prevail. Because the State has greater access to information concerning customary flight patterns and because the coercive power of the State ought not be brought to bear in cases in which it is unclear whether the prosecution is a product of an unconstitutional, warrantless search, cf. *Bumper* v. *North Carolina*, 391 U. S. 543, 548 (1968) (prosecutor has burden of proving consent to search), the burden of proof properly rests with the State and

not with the individual defendant. The State quite clearly has not carried this burden.[7]

## V

The issue in this case is, ultimately, "how tightly the fourth amendment permits people to be driven back into the recesses of their lives by the risk of surveillance." Amsterdam, *supra*, at 402. The Court today approves warrantless helicopter surveillance from an altitude of 400 feet. While JUSTICE O'CONNOR's opinion gives reason to hope that this altitude may constitute a lower limit, I find considerable cause for concern in the fact that a plurality of four Justices would remove virtually all constitutional barriers to police surveillance from the vantage point of helicopters. The Fourth Amendment demands that we temper our efforts to apprehend criminals with a concern for the impact on our fundamental liberties of the methods we use. I hope it will be a matter of concern to my colleagues that the police surveillance methods they would sanction were among those described 40 years ago in George Orwell's dread vision of life in the 1980's:

> "The black-mustachio'd face gazed down from every commanding corner. There was one on the house front immediately opposite. BIG BROTHER IS WATCHING YOU, the caption said . . . . In the far distance a helicopter skimmed down between the roofs, hovered for an instant like a bluebottle, and darted away again with a curving flight. It was the Police Patrol, snooping into people's windows." Nineteen Eighty-Four 4 (1949).

---

[7] The issue in *Jones* v. *United States*, 362 U. S. 257, 261 (1960), cited by JUSTICE O'CONNOR, was whether the defendant had standing to raise a Fourth Amendment challenge. While I would agree that the burden of alleging and proving facts necessary to show standing could ordinarily be placed on the defendant, I fail to see how that determination has any relevance to the question where the burden should lie on the merits of the Fourth Amendment claim.

Who can read this passage without a shudder, and without the instinctive reaction that it depicts life in some country other than ours? I respectfully dissent.

JUSTICE BLACKMUN, dissenting.

The question before the Court is whether the helicopter surveillance over Riley's property constituted a "search" within the meaning of the Fourth Amendment. Like JUSTICE BRENNAN, JUSTICE MARSHALL, JUSTICE STEVENS, and JUSTICE O'CONNOR, I believe that answering this question depends upon whether Riley has a "reasonable expectation of privacy" that no such surveillance would occur, and does not depend upon the fact that the helicopter was flying at a lawful altitude under FAA regulations. A majority of this Court thus agrees to at least this much.

The inquiry then becomes how to determine whether Riley's expectation was a reasonable one. JUSTICE BRENNAN, the two Justices who have joined him, and JUSTICE O'CONNOR all believe that the reasonableness of Riley's expectation depends, in large measure, on the frequency of nonpolice helicopter flights at an altitude of 400 feet. Again, I agree.

How is this factual issue to be decided? JUSTICE BRENNAN suggests that we may resolve it ourselves without any evidence in the record on this point. I am wary of this approach. While I, too, suspect that for most American communities it is a rare event when nonpolice helicopters fly over one's curtilage at an altitude of 400 feet, I am not convinced that we should establish a *per se* rule for the entire Nation based on judicial suspicion alone. See Coffin, Judicial Balancing, 63 N. Y. U. L. Rev. 16, 37 (1988).

But we need not abandon our judicial intuition entirely. The opinions of both JUSTICE BRENNAN and JUSTICE O'CONNOR, by their use of "cf." citations, implicitly recognize that none of our prior decisions tells us who has the burden of proving whether Riley's expectation of privacy was reasonable. In the absence of precedent on the point, it is appropriate for us to take into account our estimation of the

frequency of nonpolice helicopter flights. See 4 W. LaFave, Search and Seizure § 11.2(b), p. 228 (2d ed. 1987) (burdens of proof relevant to Fourth Amendment issues may be based on a judicial estimate of the probabilities involved). Thus, because I believe that private helicopters rarely fly over curtilages at an altitude of 400 feet, I would impose upon the prosecution the burden of proving contrary facts necessary to show that Riley lacked a reasonable expectation of privacy. Indeed, I would establish this burden of proof for any helicopter surveillance case in which the flight occurred below 1,000 feet—in other words, for any aerial surveillance case not governed by the Court's decision in *California* v. *Ciraolo*, 476 U. S. 207 (1986).

In this case, the prosecution did not meet this burden of proof, as JUSTICE BRENNAN notes. This failure should compel a finding that a Fourth Amendment search occurred. But because our prior cases gave the parties little guidance on the burden of proof issue, I would remand this case to allow the prosecution an opportunity to meet this burden.

The order of this Court, however, is not to remand the case in this manner. Rather, because JUSTICE O'CONNOR would impose the burden of proof on Riley and because she would not allow Riley an opportunity to meet this burden, she joins the plurality's view that no Fourth Amendment search occurred. The judgment of the Court, therefore, is to reverse outright on the Fourth Amendment issue. Accordingly, for the reasons set forth above, I respectfully dissent.