**UNITED STATES of America, Plaintiff,**

v.

**John Louis VAN DAMME, Defendant.**

**No. CR 92–36–M–CCL.**

United States District Court,
D. Montana,
Missoula Division.

March 15, 1993.

· Bernard F. Hubley, Asst. U.S. Atty., Helena, MT, for plaintiff.

Terry A. Wallace, Missoula, MT, for defendant.

## OPINION AND ORDER

LOVELL, District Judge.

This matter came on regularly for hearing on Defendant John Louis Van Damme's motion to suppress all evidence seized pursuant to a search warrant issued by the magistrate on September 10, 1992. Law enforcement officers searched Defendant's property September 11, 1992, pursuant to the warrant and seized 2,333 growing marijuana plants.

Defendant appeared personally and was represented at the hearing by Terry Wallace of Missoula, and the United States by Assistant United States Attorney Bernard F. Hubley. At the close of the hearing, Defendant's counsel requested leave of the court to file further briefing, and the court ordered both sides to file briefs within ten days. That briefing has been completed. After hearing the testimony presented at the hearing, reviewing the exhibits provided by the parties, and considering the arguments raised in the parties' memoranda, the court is prepared to rule.

This case began on September 7, 1992, when a Missoula County Sheriff's Deputy received information from a citizen informant who had observed what the informant believed to be marijuana growing in a greenhouse on Defendant's property in the Potomac area of Missoula County, Montana. Officers from the Missoula County Drug Unit contacted the citizen informant to obtain further information concerning the location of the property. The officers were told that the informant had seen a water line running to the property from a well on adjacent property. The informant had gone onto the property to inquire about Van Damme's permission to use the well and while there observed plants growing in a greenhouse inside a fenced enclosure. The informant described the plants seen as three to four feet in height with long, fan-shaped groups of leaves that narrowed on the end. The informant asserted a familiarity with the appearance of marijuana plants based on public service advertisements on television and posters.

▉ Based upon this information, Detectives Lewis and Peterson of the Missoula County Sheriff's Office proceeded to the area identified by the citizen informant and confirmed the location and description of the property. No marijuana was observed by the detectives at this time. The detectives confirmed through tax and property records that Van Damme was the owner of the property. On September 9, 1992, Detective Lewis caused a National Guard helicopter to fly over the Van Damme property for the purpose of photographing the premises. The helicopter conducted two separate fly-overs approximately 45 minutes apart. There was conflicting testimony presented at the hearing concerning the altitude of the helicopter during its passes. Defendant testified that he believed the helicopter flew at an altitude of approximately 200 feet. This estimation was based on Defendant's knowledge of the height of the trees in the vicinity.

Detective Lewis testified that he did not know the exact altitude of the helicopter because he was not looking at the altimeter but that he was sure it was over 500 feet. He based his testimony on his experience with helicopter overflights as well as his instructions to the pilot to fly at an altitude of over 500 feet. Additionally, Detective Lewis testified that the pilot assured him the helicopter was above 500 feet as they approached the Van Damme property.

Defendant called Robert Boller, a geographic systems consultant, as a rebuttal witness. Boller testified that the helicopter flyovers were at altitudes of 210 feet and 310 feet. This opinion testimony was based on Boller's purported expertise in the field of photogrammetry and calculations he had run on a computer using a space resection program. Photogrammetry was described as the process of taking measurements from aerial photographs primarily for the purpose of making maps. Space resection computer programs are used to assist photogrammetrists in determining the elevation of a camera platform. Before running the program, Boller analyzed the photographs taken from the National Guard helicopter and took measurements on the Van Damme property. Boller then ran the space resection program using the data he had assembled to generate the pictorial printouts and the altitude determinations of 210 feet and 310 feet.

Boller did not state what measurements were taken from the Van Damme property or explain how those measurements were used in the space resection program to arrive at the results. When asked to explain the mathematical basis of the calculations involved in the resection program, Boller stated that the computer uses:

" . . . various things like the law of cosines and stuff and subtracting your differences in X, your differences in Y, and differences in Z, you can get all those—compute all those angles. It's like—It's the Pythagorean Theorem with three dimensional data, X squared plus Y squared plus Z squared, that thing, the square root of that gives you the distance and then the angle is computed by the sine of the angle."

Boller: Tr. SHP p. 127.

While computing the altitude of a camera on the basis of the photographs it takes may be scientifically possible, the facts used to calculate his measurements, how the measurements were applied, and what the resection program does with the data was insufficiently established.

Considering all the testimony presented at the hearing, the court finds that the National Guard helicopter in which Detective Lewis was a passenger flew within navigable airspace at an altitude of 500 feet or more during both passes over the property.

On both passes, the helicopter skirted the western boundary of the Van Damme property as it flew south, and, after turning onto an eastward course, the helicopter passed to the south of the residential area. At no time did the helicopter fly directly above the Van Damme residence.

Detective Lewis observed the property through the viewfinder of a camera with a 600mm lens and took several photographs. He observed three plastic quonset-style greenhouses enclosed within a wooden perimeter fence. The greenhouse compound was not covered. The front doors of all three greenhouses were open. No other buildings were inside the greenhouse compound. Through the open doors, Lewis observed marijuana growing in the greenhouses.

At approximately 1:10 a.m. on September 10, 1992, Detective Lewis and DEA Agent Gale Williams entered onto the Van Damme property by crossing a partial barbed wire fence on the northern property boundary. The sky on this night was clear and the moon was nearly full. Williams and Lewis proceeded southward across the property to a five foot hogwire fence which they climbed over. They then proceeded still southward for approximately 100 feet until they reached the back of the wooden stockade fence surrounding the greenhouses. The stockade fence was approximately 12 feet in height. Williams and Lewis were able to see through the spaces between the boards in the stockade fence and observed what they recognized as marijuana growing in the greenhouses. The rear doors of all three greenhouses were open. They did not climb the stockade fence or enter the area surrounded by the stockade fence. The front of the stockade fence is approximately 204 feet from the Van Damme residence. The length of the stockade fence from front to back is approximately 100 feet. Therefore, the agents were approximately 300 feet from the residence at the time they observed what they believed to be marijuana. After verifying the presence of marijuana in the greenhouses, they left the area.

On September 10, 1992, Williams applied for and obtained a search warrant to search the Van Damme premises. The application was based on the citizen informant report, the information obtained during the fly-overs, and the personal observation of Agent Williams from his position outside the stockade fence. The application set forth the items to be searched for as growing equipment. The application stated that "[s]uch equipment includes, but is not limited to, florescent lights and their fixtures; halide lights and their mounting systems and ballasts; timers; electrical wiring; plastic plumbing pipes and pumps for circulating water and fertilizers; fertilizers for plant growth; and planting pots and needed soil for growing and transplanting marijuana plants."

Additionally, the affiant stated that from his experience other items to be searched for included "weigh scales and bags; weapons

for protection of valuables the illicit grower possesses such as marijuana and U.S. currency gained from the sale of the marijuana; records created for detailing aspects of the illicit operation such as calendars showing growth cycles, bank deposit/withdrawal slips and other banking items showing the use of such facilities for concealing the illicit gains from selling marijuana, and papers showing co-conspirators by way of monetary figures or quantitative amounts in telephone books, address books and other pieces of paper."

Agent Williams attached to the application a list of further items which could be evidence of the cultivation of marijuana. These included, but were not limited to, "marijuana, marijuana residue, wiring and electrical fixtures, Halide lights, ballasts, hydroponic and/or organic growing materials, heaters and drying equipment; weapons; documentary evidence including, but not limited to, drug records in the form of computers, computer accessories and its/their contents, address books, notations with names and telephone numbers, notations with amounts of money figures, monies, receipts regarding the acquisition of growing equipment, photos, etc., relative to the possession, cultivation, and distribution of dangerous drugs, i.e. marijuana." This list was designated as Attachment 1.

Agent Williams also affixed Attachment 2 to the application which consisted of two aerial photographs taken of the greenhouses from the helicopter. Though the search warrant referred to Attachment 1 and Attachment 2, copies of the attachments were apparently never affixed to the actual warrant. Based on the affidavit submitted by Agent Williams, Magistrate Judge Erickson issued the search warrant to search Defendant's premises.

The warrant was executed on September 11, 1992. Law enforcement officers seized 2,333 growing marijuana plants from the greenhouses as well as from two separate levels within a detached garage located a short distance from the residence.

The search inventory contained certain items which were not specifically listed in application including boat magazines with a subscriber's name affixed; a box of tampons; and some cough medicine.

The application and warrant contained a legal description of the property stating the property was located in Township 13 West and Range 16 North. The Van Damme property is actually located in Township 13 North and Range 16 West. The legal description of the property contained in the application and warrant was correct except for the township and range transposition error. The Van Damme property consisted of two lots, 18 and 19, comprising approximately 21 acres of ground. Both the house and the greenhouse compound were located on lot 18. The hogwire fence which the two agents climbed over followed the boundary of lot 18 but did not completely enclose the lot. A television satellite dish was located approximately 30 feet west of the greenhouse compound. A junk pile, including a truck body, was located approximately 50 feet west of the compound. No other buildings or facilities were near the compound.

## DISCUSSION:

■ 1. The court concludes that the greenhouse compound surrounded by the stockade fence was not part of the curtilage of Defendant's home. The Supreme Court has held that "the curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,' *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886), and therefore has been considered part of the home itself for Fourth Amendment purposes." *Oliver v. United States,* 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984). In 1987, the Supreme Court set forth a four-pronged test to apply in situations where the curtilage is at issue. *United States v. Dunn,* 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). The four factors include:

[1] [T]he proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the

area from observation by people passing by.

*Dunn,* 480 U.S. at 301, 107 S.Ct. at 1139. The Court stated that these factors do not constitute a "finely tuned formula" to be "mechanically applied." *Id.* Rather, the four factors "are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*

Under the first prong of the *Dunn* test, the court must look at the proximity of the greenhouse compound to Defendant's home. In this case, the compound was more than 200 feet from the house.

Second, though a hogwire fence ran most of the way around the entire lot on which both the house and the compound were located, the area partially enclosed by this fence consisted of several acres of property. Defendant does not contend and the court does not conclude that this perimeter fence marks the extent of the curtilage.

Though no other fence surrounds the home, the greenhouse compound is completely enclosed by a twelve foot wooden stockade fence. This fence makes the compound "a distinct portion of [Defendant's property], quite separate from the residence." *Dunn,* 480 U.S. at 302, 107 S.Ct. at 1140.

Third, because of the isolation of the greenhouse compound from the rest of the property, the lack of nearby buildings or facilities, and the absence of any indicia of activities commonly associated with domestic life, the investigating officers had no reason to deem the greenhouse compound as part of Defendant's home. Additionally, the citizen informant's report provided the officers with some "objective data indicating that the [compound] was not being used for intimate activities of the home." *Dunn,* 480 U.S. at 302, 107 S.Ct. at 1140.

Fourth, though the stockade fence presented a significant obstacle to casual observation on the ground, Defendant did nothing to prevent observation of the interior of the compound from the air. Defendant also did nothing to prevent the viewing of the inside of the compound by someone on the outside looking through the cracks between the boards of the fence. Additionally, the doors of the greenhouses were open exposing the plants growing inside to observation and identification from the air and the ground.

Based on this application of the *Dunn* factors to the circumstances of this case, the court concludes that the greenhouse compound was outside the curtilage of Defendant's home.

■ 2. Because the greenhouse compound was outside the curtilage of Defendant's home, the "open fields" doctrine is held to be applicable in this case. In *Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), the Supreme Court held that "an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." 466 U.S. at 178, 104 S.Ct. at 1741. The Court further stated that "open fields do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or surveillance." 466 U.S. at 179, 104 S.Ct. at 1741. To fall under the "open fields" doctrine an area "need be neither 'open' nor a 'field' as those terms are used in common speech." 466 U.S. at 180 n. 11, 104 S.Ct. at 1742 n. 11.

In this case, Defendant constructed a greenhouse compound more than 200 feet from his dwelling and surrounded it with a twelve foot high stockade fence. This fence, however, does not create a legitimate expectation of privacy. As the Court stated in *Oliver,* "we reject the suggestion that steps taken to protect privacy establish that expectations of privacy in an open field are legitimate." *Id.* at 182, 104 S.Ct. at 1743. Under *Oliver,* "[t]he test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity. Rather, the correct inquiry is whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." *Id.* at 182–183, 104 S.Ct. at 1743. Therefore, "only the curtilage, not the neighboring open fields, warrants the Fourth Amendment pro-

tections that attach to the home." *Id.* at 180, 104 S.Ct. at 1742.

■ 3. The court concludes that the helicopter fly-overs did not violate Defendant's Fourth Amendment rights. The Supreme Court has held that law enforcement officers are not precluded from observing activities "from a public vantage point where [they have] a right to be and which renders the activities clearly visible." *California v. Ciraolo,* 476 U.S. 207, 213, 106 S.Ct. 1809, 1812, 90 L.Ed.2d 210 (1986). The Court has further held that officers are free to inspect property "from the vantage point of an aircraft flying in the navigable airspace." *Florida v. Riley,* 488 U.S. 445, 450, 109 S.Ct. 693, 696, 102 L.Ed.2d 835 (1989). In this case, the court has already found from testimony presented at the hearing that the helicopter flew at an altitude above 500 feet at all times relevant to the motion to suppress. This is certainly within public navigable airspace for non-congested areas. 14 C.F.R. § 91.119(c).

Furthermore, the court notes that FAA regulations specifically allow helicopters to be operated at less than the minimums for fixed-wing aircraft "if the operation is conducted without hazard to persons or property on the surface." 14 C.F.R. § 91.119(d). There is nothing in the record that indicates any potential hazard to persons or property on the ground during the fly-overs. Therefore, even had the court found that the fly-overs were conducted at less than 500 feet, the helicopter would not have been violating the law.

Additionally, the court applies here the conclusion of the Supreme Court in *Riley* that helicopters flying at an altitude of 500 feet, as in this case, are not "sufficiently rare in this country to lend substance to respondent's claim that he reasonably anticipated that his greenhouse would not be subject to observation from that altitude." *Riley,* 488 U.S. at 451, 109 S.Ct. at 697. Most importantly, as the greenhouse compound was not part of the curtilage, could easily be viewed from the air, and because the doors of the greenhouses were open at the time of the fly-overs, Defendant had no reasonable expectation of constitutional protection under the Fourth Amendment from observation of the

greenhouses and their contents by law enforcement officers flying in a helicopter. As the Supreme Court recognized in *Oliver,* in the open field context "the public and police lawfully may survey lands from the air." 466 U.S. at 179, 104 S.Ct. at 1741. (footnote omitted).

■ 4. The use of a camera to photograph the greenhouse compound during the fly-overs did not violate the Fourth Amendment in this case. In *Dow Chemical Co. v. United States,* 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986), it was held that the "taking of aerial photographs of an industrial plant complex from navigable airspace is not a search prohibited by the Fourth Amendment." *Id.* at 239, 106 S.Ct. at 1827. Though the greenhouse compound photographed in this case was not an industrial complex, it was in the open field. The Court specifically held in *Dow Chemical* that an industrial complex is "comparable to an open field and as such it is open to the view and observation of persons in aircraft lawfully in the public airspace immediately above or sufficiently near the area for the reach of cameras." *Id.* Therefore, the use of the camera in this case does not raise any constitutional concerns.

■ 5. The observation of the greenhouse and the plants inside by law enforcement officers standing outside the stockade fence did not constitute an unlawful search in violation of the Fourth Amendment. Because the greenhouse compound was not within the curtilage but in the open fields, Defendant had no legitimate expectation of privacy concerning the compound or that it would "remain free from warrantless intrusion by government officers." *Oliver,* 466 U.S. at 181, 104 S.Ct. at 1742. Therefore, the fact that the officers entered onto Defendant's property, traversed open fields, climbed over fences in those open fields and stood in open fields while observing the greenhouses through the stockade fence does not constitute a violation of Defendant's Fourth Amendment rights under the "open fields" doctrine.

■ 6. State law does not affect the legality of this search. The Ninth Circuit has consistently held that "evidence obtained by

**1560**

federal officials acting in concert with state officials in violation of state law but in compliance with federal law is admissible in federal court." *United States v. Chavez–Vernaza*, 844 F.2d 1368, 1372 (1987).

■■■■ 7. The application for the search warrant contained sufficient information to support a finding of probable cause by the issuing magistrate. Probable cause is established if the facts contained in the submitted affidavit would lead a reasonable judge to believe the evidence sought will be found in the particularly described location. *United States v. Martinez*, 588 F.2d 1227, 1234 (9th Cir.1978). The issuing magistrate must evaluate the affidavit under the "totality of the circumstances" test. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The reviewing court simply examines whether the magistrate had a "substantial basis" for concluding that the affidavit established probable cause. *Id.* at 236, 103 S.Ct. at 2331.

In this case, the magistrate's finding of probable cause was based upon a citizen informant's report of having seen marijuana growing on Defendant's premises. This report was corroborated by law enforcement officers to the extent that the physical location and description of the property was as described by the informant. The legally executed fly-overs provided photographs of the greenhouse compound and the plants growing therein. Additionally, the affidavit contained a record of the personal observations of a veteran DEA agent who had seen what his experience and training led him to believe was marijuana growing in the greenhouses on Defendant's property. Based on this information, it is clear that the issuing magistrate judge had a substantial basis to conclude there was probable cause to believe marijuana was growing and would be found on Defendant's premises.

■■■■ 8. The search warrant issued in this case was not an unconstitutional general warrant. It is essential that a warrant be sufficiently definite so that an officer executing it can identify the property sought with reasonable certainty. *Go–Bart Importing Co. v. United States*, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931). In this case, the

agent applying for the warrant set forth the equipment he knew from experience was necessary for the cultivation and sale of marijuana. Attachment 1 sets forth those items with particularity. However, the language used stated that the items to be seized were not limited to only those items specifically listed but included any other items which might be used for the cultivation and sale of marijuana. The court concludes that the inclusion of the words "including but not limited to" does not render the warrant a general warrant. This language simply recognized that items associated with a marijuana grow operation but not specifically listed in the warrant might be found. Because the language limits the scope of the search to such items associated with marijuana cultivation and distribution, the warrant does not offend the particularity requirement.

■■■■ 9. The scope of the warrant was not overly broad nor unnecessarily intensive. Various items were listed in the return inventory which were not specifically listed on the warrant and which had no apparent use in the cultivation of marijuana. However, each of these items could reasonably be expected to aid in the identification of co-conspirators involved with the grow operation.

■■■■ 10. Minor discrepancies in the property description do not render the warrant invalid. The court noted earlier that a transposition of letters occurred within the legal description of the property concerning the range and township. Nevertheless, the description was entirely adequate in describing the property for law enforcement officers seeking to identify it.

■■■■ 11. A technical defect in the form of a clerical error in the warrant does not require suppression. Though Attachment 1, which was a particular description of the items sought to be searched for by warrant, and Attachment 2, which contained photographs of the premises, were referred to in the search warrant, neither of them were properly affixed thereto. Nevertheless, such a failure is a technical error. Suppressing evidence on such a technicality would not serve the function the exclusionary rule was

designed to achieve. *Massachusetts v. Sheppard*, 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984).

IT IS HEREBY ORDERED that Defendant John Louis Van Damme's motion to suppress evidence is DENIED.

This Opinion and Order shall stand as the court's findings of fact and conclusions of law.

The clerk is directed forthwith to notify counsel and Magistrate Judge Leif B. Erickson of entry of this order.