**Michael Slocumb MOSS, Appellant,**

v.

**STATE of Texas, Appellee.**

**No. 04–93–00024–CR.**

Court of Appeals of Texas, San Antonio.

May 11, 1994.

Raymond E. Fuchs, San Antonio, for appellant.

Susan Patterson, Asst. Dist. Atty., Kerrville, for appellee.

Before BUTTS, BIERY[1] and JOHN F. ONION, Jr., JJ.

## OPINION

JOHN F. ONION, Jr., Justice, Assigned.[2]

This appeal is taken from a conviction for possession of a usable quantity of marihuana, to-wit: "five pounds or less but not over four ounces."

Appellant entered a plea of nolo contendere to the indictment in a bench trial. The trial court found appellant guilty and assessed his punishment at ten years' imprisonment and a fine of five thousand dollars. The imposition of the sentence was suspended, and appellant was placed on probation for a term of ten years subject to certain conditions. The punishment imposed was the result of a plea bargain. Notice of appeal was properly given. *See* TEX.R.APP.P. 40(b)(1).[3]

Appellant advances three points of error. In his first two points, appellant urges that the trial court erred in overruling the pretrial motion to suppress evidence seized as a result of a warrantless search of his property by state agents employing surveillance from a helicopter in violation of federal and state constitutional provisions. U.S. CONST. AMENDS. IV, XIV; TEX. CONST. art. I, § 9. In the third point of error, appellant contends that the trial court erred in refusing to suppress the fruits of a warrantless intrusion and seizure after the marihuana was observed by aerial surveillance.

---

1. Justice Fred Biery not participating.

2. Assigned to this case by the Chief Justice of the Supreme Court of Texas pursuant to TEX.GOV'T CODE ANN. § 74.003(b) (Vernon 1988).

3. This is appellant's second appeal. The original conviction was reversed because the nolo contendere plea was involuntarily entered. The trial court and the parties were under the erroneous assumption that appellant could appeal nonjurisdictional issues arising out of the denial of his motion to suppress evidence based on his non-negotiated nolo contendere plea. *Moss v. State,* No. 04–91–00247–CR (Tex.App.—San Antonio Aug. 19, 1992, pet. dism'd) (unpublished).

Prior to his first conviction, *see supra* footnote 3, appellant filed a pretrial motion to suppress evidence. At the conclusion of a hearing on said motion, the trial court overruled the motion, declining to suppress the evidence seized. Appellant's contentions are directed to this ruling. We shall discuss all three points together as they are interrelated.

At the suppression hearing, the State admitted that there had been a warrantless search and assumed the burden of proving the validity of the search. *See Russell v. State*, 717 S.W.2d 7, 9–10 (Tex.Crim.App. 1986). The State relied upon two witnesses. Appellant testified and also relied upon the testimony of neighbors. Gene Matocha, a veteran pilot-investigator with the Texas Department of Public Safety, testified that he had been involved in numerous narcotic aerial surveys in various parts of Texas; that he flew aerial surveys for marihuana on an annual basis in east Texas; and that on occasion he flew surveys in the Hill Country of the state. Matocha testified that he flew D.P.S. helicopters in accordance with Federal Aviation Administration (FAA) regulations, but was not required to do so with public-use helicopters.

On August 14, 1990, Matocha flew a survey in Kendall County on request. James Walker, a D.P.S. narcotic agent, Deputy Sheriff Hugo Boehm, and a game warden accompanied Matocha in a 1986 blue and silver Bell Jet Ranger helicopter. They were to look for a methamphetamine (speed) lab and a "chop shop," a stolen car operation. Their search for these locations was unsuccessful. Matocha revealed that the helicopter then circled through the Alamo Springs Subdivision coming down to about 100 feet over three or four residences. The officers did spot a foreign-made automobile in an isolated location. The helicopter dropped down to about 100 feet, the officers obtained the vehicle's license plate number and ran a registration check. It was determined that the car had not been stolen. As the helicopter rose out of the canyon where the automobile was

located and reached an altitude of about 350 to 400 feet, Matocha, with a naked-eye observation,[4] spotted marihuana growing in a garden "about a quarter of a mile to our right front." The fenced garden was about thirty to forty yards behind a house in an isolated area, an "extremely private location."

The observation necessitated a closer look to make a positive identification of the substance. Matocha circled and brought the helicopter down to "about 100 feet" over the garden and made a positive identification of about twenty growing marihuana plants. The helicopter circled and Matocha made a second pass over the garden area. Photographs were taken. Ground units, across the county at Comfort, were then called. At first, as the helicopter circled, there was no response from the house. Then a man (later identified as appellant) came out of the house, looked up, and then walked to the front gate that he appeared to lock. He then returned to the house. Fearing that the marihuana would disappear, Matocha decided to land the helicopter. He brought the aircraft down to about fifty feet over adjoining property north of appellant's property. The space was too small and Matocha aborted the landing attempt and continued circling over appellant's house and garden to prevent the destruction or removal of the marihuana. The ground units arrived in about twenty minutes. Matocha observed the ground units summon appellant to his front gate by use of loud speakers. The two units "went in." Matocha landed the helicopter in a clear field about a quarter of a mile away. A vehicle took agent Walker and Deputy Boehm to the scene.

James Walker, a veteran narcotics agent, testified that he was familiar with marihuana and able to identify the substance from the air. He corroborated much of Matocha's testimony. He testified that the helicopter came down to about seventy-five to fifty feet above the garden in question located about 150 feet from the residence. From the helicopter, Walker was able to make a positive identification of the marihuana plants in the

4. All the observations mentioned in the testimony at the suppression hearings were naked-eye observations.

garden and was also able to see marihuana plants "coming out" of a hole in a cloth-covered shed about 125 feet from the residence. Walker also stated that the attempt to land the helicopter was abandoned because it was too dangerous. Walker acknowledged that the helicopter came down to "tree level or below," but it is not clear if he was referring to the landing attempt or the subsequent circling of the helicopter while awaiting the arrival of the ground units.

Walker did observe Officers Tommy Leif-este and Ira Langsford in the ground units summon appellant to his front gate by the use of bullhorns. Thereafter, the helicopter landed and Walker returned to the scene in a vehicle in about four minutes. He did not know if the officers on the ground had entered premises before his arrival and did not know if those officers had approached the front gate with their weapons drawn.

Appellant told Walker that the marihuana was grown only for appellant's personal use and that there were not many plants. He asked that "no big deal be made of it." Walker stated that he asked for and received appellant's consent to search. Appellant then voluntarily led the officers to the garden and to the shed. In the garden, the officers found twenty marihuana plants about four feet tall growing among Johnson grass and sunflower plants. Four male marihuana plants were found in the cloth-covered shed.[5] Walker testified that appellant later signed a written consent form authorizing a search of the residence, but no contraband was found there.

Appellant testified that he lived on the thirty-five acre tract in the Alamo Springs Subdivision with his wife and three children, ages five, eight, and twelve years; that he was a self-employed furniture designer and builder; and that on the morning of August 14, 1990, he was preparing lunch for the children while his wife was at work.

At the time in question, appellant heard a helicopter and then saw it come in over his garden at about thirty-five feet and drop to about twenty feet below the level of the trees behind the garden. The helicopter flew in circles over the house and garden for about thirty to forty minutes. The wind turbulence of the helicopter flattened what tomato and other vegetable plants he had left in the garden and broke off the limbs of his fruit and other trees on the property. Appellant stated that the noise of the helicopter scared his children, who began to cry and became somewhat disoriented.

Appellant related that ground units arrived and that he was called out of his house by the use of bullhorns. Appellant came out of the house dressed in gym shorts and a tank top followed by his five-year-old daughter, who was scared to leave his side. Appellant stated that Deputy Leifeste had a drawn sawed-off shotgun pointed at him and his child and was screaming at him. Another officer was behind a car door with a pistol drawn, holding it with both hands. The officers screamed at him to get away from the child and to keep his hands up. The officers demanded admission to the property. When appellant asked if they had a search warrant, the officers said that they did not have one, but told appellant: "Well, it won't make any difference whether we have a search warrant or not. We can get one, so you might as well cooperate and open your gate, because the only difference it will be is about an hour and a half to two hours' difference." Appellant was then told that he could not return to the house to take care of the other two children as he was under arrest. Appellant was then instructed: "You can stand right here with us, if you want, but the helicopter is going to stay on top of your house and your garden and we're going to stand here with you and your five-year-old daughter until we get a search warrant."

When asked if he consented to having the officers enter his property, appellant stated that he did so "under duress."

Appellant testified that his garden could

5. The marihuana seized, after it was dried and manicured, was determined to weigh seventeen

not be seen from his front gate [6] or from the property lines of his thirty-five acre tract carved out of a former 3060 acre ranch. He stated that he had lived on the tract for eight years and that every year helicopters had flown over the property at the altitude of 400 to 100 feet, but on August 14, 1990, the helicopter reached the lowest level he had seen such aircraft fly.

George MacNaughton testified that he had been out jogging on the morning in question when a silver and blue helicopter came in over his property level with the roof line of his two story house; that the helicopter stayed in the area about five minutes; and that helicopter flight knocked items off the wall in his house and frightened his child.

MacNaughton recalled one occasion when he looked out a window of his house and saw a military helicopter armed with a machine gun.[7] He stated that these helicopter flights "happened so much, though, out there." MacNaughton lived a mile or two from appellant but in the same subdivision.

Grace Marie Butcher, who lived about a mile from appellant, testified that on the morning of August 14, 1990, a blue and gray helicopter flew over her trailer house for about five minutes at an altitude of about twenty feet, touching the top of the trees. Her children were scared and running in circles. She described the incident as a horrifying experience.

Bill Moss, appellant's brother, testified that a gray-blue helicopter came over his house in the Alamo Springs Subdivision on the morning of August 14, 1990, at about thirty to thirty-five feet. When a neighbor later called about speeding vehicles that had been seen in the subdivision, Bill Moss telephoned appellant's house. Appellant's twelve-year-old daughter told him that the police were all over the place and "they had a gun on my dad." The daughter was "crying out of control."

When asked if helicopters frequently flew over the subdivision, Bill Moss stated that it seemed to be a "yearly deal" and recalled an instance in which a state helicopter flew so low that he had been able to observe the laughing passengers.

At the conclusion of the suppression hearing, the trial court noted the holding of the plurality in *Florida v. Riley*, 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989), and, more particularly, Justice O'Connor's concurring opinion. The motion to suppress was overruled. We shall jointly examine appellant's three contentions in light of the trial court's ruling.

The majority in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), concluded that the trespass doctrine was no longer controlling and adopted a new standard: the fourth amendment protects privacy expectations on which a person justifiably relies. *Id.* at 350, 88 S.Ct. at 510. Courts, however, have come to rely upon the following standard articulated by Justice Harlan's concurrence in *Katz:*

> As the Court's opinion states, "the Fourth Amendment protects people, not places." The question, however, is what protection it affords to those people. Generally, as here, the answer to that question requires reference to a "place." My understanding of the rule that has emerged from prior decisions is that there is a two fold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation to be one that society is prepared to recognize as "reasonable."

*Id.* at 361, 88 S.Ct. at 516.

This two-part inquiry has become the basis for determining the extent of fourth amendment protection. Courts, however, have paid little attention to the first prong of the test. *See* 1 Wayne R. LaFave, *Search and Seizure* § 2.1(c), at 309 (2d ed. 1987). Courts frequently do not distinguish between the two prongs of the test. They assume that expectations of privacy exist and focus

---

ounces.

6. Agent Walker confirmed that the garden could not be seen from the public road or the front gate.

7. · Pilot Matocha testified that he understood the National Guard flew helicopters in the area.

on the reasonableness requirement of the second prong. *Id.* The fundamental inquiry of Katz's second prong is whether the police, through law-enforcement techniques, will encroach too heavily upon society's sense of security or impose unreasonable burdens upon those who wish to ensure their security. *See Id.,* § 2.1(d), at 313. The final decision, therefore, is a value judgment.

In *California v. Ciraolo,* 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), the United States Supreme Court held that the fourth amendment was not violated by a warrantless naked-eye observation by a police officer of a fenced-in backyard from a fixed-wing aircraft at 1000 feet. The *Ciraolo* Court employed the *Katz* two-pronged inquiry. The first inquiry was not challenged by the prosecution and was presumed to have been met. *Id.* at 211, 106 S.Ct. at 1811. The prosecution challenged the second inquiry as to whether the expectation of privacy was reasonable, arguing that the defendant had knowingly exposed his activity to public scrutiny and that his expectations of privacy therefore were unreasonable. The Supreme Court agreed that the defendant could not reasonably have expected that the contents of his greenhouse were protected from public or official inspection from the air, since he left the greenhouse's sides and roof partially open revealing the marihuana. The Court reasoned that, although the surveillance was of a curtilage, it was from public navigable airspace and was not physically intrusive. Accordingly, the surveillance from the air was not a search under the fourth amendment. The Court thus affirmed the public view doctrine even as to observations from the air of a backyard curtilage of a house.

In *Dow Chemical Co. v. United States,* 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986), the Court held that aerial photographs by the Environmental Protection Agency of the Dow Chemical's plant complex was not a fourth amendment search. Although it recognized the existence of industrial curtilage, the Court found Dow's chemical facility more analogous to open fields. The Court concluded there was no search because the aircraft was in public airspace and the surveillance was of open fields.

Then came *Florida v. Riley,* 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989). In August, 1984, a Florida county sheriff's office helicopter approached a rural mobile home on a five acre tract rented by Riley. Deputy Gell was following an anonymous tip that Riley was growing marihuana. As the helicopter arrived, Gell observed a "Do Not Enter" sign posted in front of the home and a wire fence enclosing a portion of the property. Within that fence was a greenhouse. The helicopters circled twice at four hundred feet while Gell photographed the home and greenhouse. The roof of the greenhouse was approximately one-tenth open due to missing panels. Gell was able to observe marihuana through this opening. Gell secured a search warrant based on his observations. Gell later found the marihuana was not visible from the ground. During the execution of the warrant, forty-four marihuana plants were found in the greenhouse. Riley was charged with the unlawful possession and manufacture of marihuana. The trial court granted the motion to suppress. The appellate process began, and the cause eventually reached the United States Supreme Court. There, the Court held, per a four justice plurality and one justice concurrence, that a naked-eye surveillance of a greenhouse in a residential backyard from a helicopter at 400 feet is not a search within the meaning of the fourth amendment.

The plurality opinion relied exclusively on *Ciraolo.* The ground level precautions that Riley had taken to protect against public observations manifested his expectation of privacy, but his expectation was not one that society is prepared to accept as reasonable. *See Riley,* 488 U.S. at 450–51, 109 S.Ct. at 696–97. Because Riley could not reasonably expect that the contents of the greenhouse would be protected from observation by an airplane in legal airspace, he could not reasonably expect privacy from observations by a helicopter in legal airspace. Helicopters are not bound by the altitude limitations for fixed-wing aircraft and because the overflight at 400 feet was not hazardous, the surveillance occurred in legal airspace. *Id.* at 451,

109 S.Ct. at 697.[8]

Justice O'Connor concurred in the result in *Riley,* but believed that the plurality's approach rested the scope of the fourth amendment protections too heavily on compliance with FAA regulations. She asserted that the focus should be on the regularity of public flights at 400 feet over Riley's greenhouse and reasoned that the more well-travelled the airways, the less reasonable Riley's expectation of privacy was from aerial surveillance. Justice O'Connor placed the burden of proving the irregularity of such flights on the defendant. Applying her standard to the facts of the case, she concluded that Riley had not met his burden and that his expectation of privacy was unreasonable. *Id.* at 455, 109 S.Ct. at 699.

Justice Brennan, joined by Justices Marshall and Stevens, dissented. Justice Blackman dissented separately. Justice Brennan believed that the correct inquiry is not "whether the police were where they had a right to be, but whether public observation of Riley's curtilage was so commonplace that Riley's expectation of privacy in his backyard could not be considered reasonable." *Id.* at 460, 109 S.Ct. at 702. He also believed that the prosecution should bear the burden of proving the regularity of the overflights, disagreeing with the plurality and Justice O'Connor. Justice Blackman believed that the parameters of the fourth amendment in the context of aerial surveillance should depend on the frequency of nonpolice helicopter flights at the same altitude as that of the surveillance. *Id.* at 467–68, 109 S.Ct. at 705–

06. He would also place the burden of proof upon the prosecution.[9]

The application of Riley is not easy.[10] The plurality asserted that the determination of an individual's expectation of privacy from helicopter surveillance turns on whether the helicopter is violating the law, specifically, FAA regulations.[11] A majority of the justices, however, disagreed. The dissenters and Justice O'Connor asserted that the reasonableness of an individual's expectation of privacy should turn primarily on the frequency of public helicopter flights at the height in question. The plurality did assert that an expectation of privacy from helicopter surveillance would likely be more reasonable if (1) the helicopter interferes with the normal use of the curtilage; (2) there is undue noise, wind, dust, or threat of injury; or (3) intimate details connected with the use of the home or curtilage are observed. *Riley,* 488 U.S. at 452, 109 S.Ct. at 697.

 In the instant case, the naked observation by the helicopter of marihuana plants approximately a quarter of a mile away while the helicopter was at an altitude of 350 to 400 feet in navigable public airspace was not at that point, under the circumstances presented, a "search" under the fourth amendment, particularly in light of the holding in *Riley.* The pilot explained that in order to make a positive identification of the plant substance, he brought the police helicopter down to 100 feet or "about 100 feet" over appellant's garden. He testified that no safety question was involved, that he was following FAA regulations, and that the helicopter was in navigable public airspace. At

---

**8.** While Federal Aviation Administration (FAA) regulations permit fixed-wing aircraft to be operated at an altitude of 1000 feet while flying over congested areas and at an altitude of 500 feet above the surface in other than congested areas, helicopters may be operated at less than the minimum for fixed-wing aircraft if the operation is conducted without hazard to persons or property on the surface. *See* 14 CFR § 91.119 (1993), which was in effect at the time of the instant overflight; *see also Riley,* 488 U.S. at 451 n. 3, 109 S.Ct. at 697 n. 3.

**9.** For a discussion of the burden of proof, see David J. Stewart, *Florida v. Riley: The Emerging Standard for Aerial Surveillance of the Curtilage,* 43 Vand.L.Rev. 275, 294 (1990).

**10.** *See* Bradley W. Foster, *Warrantless Aerial Surveillance and The Right to Privacy: The Flight of the Fourth Amendment,* 56 J.Air L. & Com. 719 (1991); Sharon Flanery, Note, *Constitutional Law—Fourth Amendment—Right of Privacy—Warrantless Aerial Search—Florida v. Riley,* 28 Duq.L.Rev. 327 (1990); Daniel R. Hansen, Note, *Warrantless Aerial Surveillance and Florida v. Riley: the Loss of Liberty,* 1990 Utah L.Rev. 407.

**11.** "This is not to say that an inspection of the curtilage of a house from an aircraft will always pass muster under the Fourth Amendment simply because the plane is within the navigable airspace specified by law." *Riley,* 488 U.S. at 451, 109 S.Ct. at 697.

this altitude, the pilot and agent Walker were about to make a positive identification of the marihuana plants in the garden and in the shed through a hole in the cloth roof.

Appellant testified that in the eight years he had lived on the property in question there had been helicopter flights over the property every year varying from 100 to 400 feet, but that the instant flight was the lowest that he had ever seen. Appellant did not distinguish between governmental and public helicopters nor did any of the other witnesses with any precision. Neighbor MacNaughton related that helicopter flights "happened so much—out there," and appellant's brother also made reference to helicopter flights above the Alamo Springs Subdivision.

There can be little question from the evidence that appellant exhibited an actual (subjective) expectation to privacy that met the first prong of the *Katz* test. But what is the expectation that society is prepared to recognize as "reasonable"? Given the testimony, the fact that the burden of proof was placed on appellant by the plurality opinion in *Riley* and by Justice O'Connor's concurring opinion to show the irregularity or rarity of helicopter over flights, and the fact that the trial court was the trier of fact at the suppression hearing,[12] we conclude that at the point of positive identification of the marihuana, there still was no fourth amendment search. *See United States v. Clark*, 980 F.2d 1143, 1145 (8th Cir.1992). The officers, however, acquired probable cause.

In the instant case, unlike *Ciraolo* and *Riley*, the officers did not then use their observations as the basis for a search warrant based on probable cause. Here, the plot thickens. The pilot testified that when appellant came out of his house, apparently locked his front gate, and returned to the house, she and the other officers became fearful that if they left the scene the marihuana would disappear. The attempt to land the helicopter was ill-fated, and it continued to circle the area for some twenty to forty minutes. It was during this prolonged circling that there was noise, wind, turbulence, and the children became upset. There can be little question that at this point there was warrantless intrusion on appellant's property that violated appellant's reasonable expectation of privacy, albeit there was no seizure.

Warrantless intrusions and searches are presumptively unreasonable. *United States v. Karo*, 468 U.S. 705, 717, 104 S.Ct. 3296, 3304, 82 L.Ed.2d 530 (1984). The burden of proving an exception from the warrant requirement falls upon the prosecution. *Russell*, 717 S.W.2d at 9–10. Circumstances may place a police officer in situations in which a warrantless entry or intrusion is viewed as a reasonable reaction by the officer. Exigent circumstances may be an exception to the warrant requirement. A warrantless search may be justified if the State shows the existence of probable cause at the time and the existence of exigent circumstances that made the procuring of a search warrant impracticable. *McNairy v. State*, 835 S.W.2d 101, 106 (Tex.Crim.App. 1991); *Nastu v. State*, 589 S.W.2d 434, 439 (Tex.Crim.App. [Panel Op.] 1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 3000, 64 L.Ed.2d 862 (1980). Situations creating exigent circumstances usually include factors pointing to some danger to the officer or victim, an increased likelihood of apprehending a suspect, or the possible destruction or removal of evidence. *McNairy*, 835 S.W.2d at 107; *see also United States v. Rubin*, 474 F.2d 262, 268–69 (3d Cir.), *cert. denied*, 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973) (noting that the ready destruction of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic); *Rodriguez v. State*, 838 S.W.2d 780, 781 (Tex.App.—Corpus Christi 1992, no pet.).

Here, the State established probable cause and exigent circumstances—a need to prevent the imminent destruction, removal, or concealment of the contraband intended to

---

12. *See Taylor v. State*, 604 S.W.2d 175, 177 (Tex. Crim.App. [Panel Op.] 1980). The trial court could accept or reject the testimony of any witness. The trial court could have accepted Mato- cha's testimony the helicopter did not drop below "about 100 feet" during the initial surveillance.

be seized. *Id.* at 781. Under the facts, we reject appellant's argument that the officers created the exigent circumstances in order to justify the warrantless intrusion.[13]

■ The exigent circumstances exception came to an end when appellant was arrested without a warrant and taken into custody at his front gate [14] accompanied by his five-year-old daughter and the officers knew or were informed that only two other children were in the house. Because the exigency had ended, the officers then should have maintained control of the premises while a search warrant was obtained instead of proceeding with a full warrantless search and seizure of evidence under any claim of exigent circumstances. *See Segura v. United States*, 468 U.S. 796, 798–99, 104 S.Ct. 3380, 3382, 82 L.Ed.2d 599 (1984); 2 Wayne R. LaFave, *Search and Seizure* § 6.5(b) (2nd ed. 1987 & Supp.1993). That is, unless the State had a right to rely upon another exception to the rule requiring both a warrant and probable cause, a search warrant should have been secured.

■ When a search is conducted pursuant to a valid consent to search, another exception arises. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *Juarez v. State*, 758 S.W.2d 772, 776 (Tex.Crim.App.1988). Consent must be freely and voluntarily given to be considered effective. *Johnson v. State*, 803 S.W.2d 272, 286 (Tex.Crim.App.1990), *cert. denied*, 501 U.S. 1259, 111 S.Ct. 2914, 115 L.Ed.2d 1078 (1991). The burden of proof is upon the State to show by clear and convincing evidence that the consent was freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968); *Johnson*, 803 S.W.2d at 286–87. The consent must be positive and unequivocal, and police must not have employed duress or coercion, actual or implied, in obtaining permission to search. *Reyes v. State*, 741 S.W.2d 414, 430 (Tex.

Crim.App.1987); *Meeks v. State*, 692 S.W.2d 504, 509 (Tex.Crim.App.1985). Consent must not be physically or psychologically coerced. *Paprskar v. State*, 484 S.W.2d 731, 737 (Tex. Crim.App.1972), *overruled on other grounds*, *Kolb v. State*, 532 S.W.2d 87, 89 n. 2 (Tex. Crim.App.1976). Whether a consent to a search was in fact voluntary is a question of fact to be determined from the "totality of the circumstances." *Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2047; *Juarez*, 758 S.W.2d at 775; *Dickey v. State*, 716 S.W.2d 499, 504 (Tex.Crim.App.1986).

■ Consent may be ineffective if induced by a show of force by police or other coercive surroundings at the time the consent is given. *See Johnson*, 803 S.W.2d at 287. The display of weapons is a coercive factor that sharply reduces the likelihood of freely given consent. *Lowery v. State*, 499 S.W.2d 160, 168 (Tex.Crim.App.1973). "This is certainly true when the person from whom the consent is being sought has just been arrested at gunpoint, but it is likewise the case when the person merely answers the door to find officers with guns drawn." 3 Wayne R. LaFave, *Search and Seizure* § 8.2(b), at 181–82 (2nd ed. 1987).

■ The fact that a person is under arrest does not, in and of itself, prevent a free and voluntary consent from being given. *Meeks*, 692 S.W.2d at 509. Custody is merely one of the factors to be considered. *Id.* The burden of proving that consent was freely given cannot be discharged by showing no more than acquiescence to a claim of lawful authority. *Bumper*, 391 U.S. at 548–49, 88 S.Ct. at 1791–92; *Reyes*, 741 S.W.2d at 430. While a warning that an individual does not have to consent to a search and has the right to refuse is not required or essential, the showing of a warning is of evidentiary value in determining whether a valid consent was given. *Meeks*, 692 S.W.2d at 510. Likewise, the lack of any warning, though not required, is also probative on the issue of consent. *Id.*

---

13. Appellant relies upon *United States v. Munoz–Guerra*, 788 F.2d 295 (5th Cir.1986); *United States v. Morgan*, 743 F.2d 1158 (6th Cir.1984), *cert. denied*, 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985); *United States v. Thompson*, 700 F.2d 944 (5th Cir.1983).

14. The parties have not raised the question of the validity of appellant's arrest. The State does not rely upon a search incident to arrest to justify the seizure of the marihuana in question.

An otherwise voluntary consent is not vitiated by the fact an officer asserts that he could seek or would obtain a search warrant if consent is refused. See *Johnson*, 803 S.W.2d at 287; *Grant v. State*, 709 S.W.2d 355, 357 (Tex.App.—Houston [14th Dist.] 1986, no pet.). A threat to seek a warrant cannot always be said to be without probative effect. See *Stephenson v. State*, 494 S.W.2d 900, 904–05 (Tex.Crim.App.1973) ("the assertion is but one factor, albeit an important one, to be evaluated realistically, within the context it was uttered...."); 3 LaFave, *Search and Seizure*, § 8.2(c), at 186.

■ In the instant case, the undisputed evidence shows that appellant was "bull-horned" from his residence by armed officers and placed under arrest. See *Amores v. State*, 816 S.W.2d 407, 411–12 (Tex.Crim.App. 1991). Agent Walker arrived on the scene some four minutes later. He was the only State witness to testify as to consent. There was no showing that appellant was given *Miranda* [15] warnings or advised of his right to refuse to consent. Walker testified that he asked for appellant's consent to search and that appellant consented. Appellant testified he was arrested with guns pointed at him and his five-year-old daughter, as one officer screamed at him. When he asked about a search warrant, the armed officers told him that they could get one within two hours, but he and his five-year-old daughter would have to stay where they were until the warrant was secured; and that appellant could not return to the house to take care of his other two children. Appellant admitted that he consented but claimed that it was under duress. Walker could not remember whether the other officers had their guns drawn when he arrived. The officers in the ground units were not called to testify. We conclude, as a matter of law, that the State did not sustain its burden of proof by showing by clear and convincing evidence that the consent was freely and voluntarily given.

■ The State contends, however, that the search of the fenced garden and shed came within the "open fields" doctrine first enunciated in *Hester v. United States*, 265 U.S. 57, 59, 44 S.Ct. 445, 446, 68 L.Ed. 898 (1924), and clarified in *Oliver v. United States*, 466 U.S. 170, 178–79, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214 (1984). The "open fields" doctrine allows a law enforcement officer to enter and search an area of land without. a warrant. *Beasley v. State*, 683 S.W.2d 132, 133 (Tex.App.—Eastland 1985, pet. ref'd) (citing *Oliver*). See also *Goehring v. State*, 627 S.W.2d 159, 162–63 (Tex.Crim. App. [Panel Op.] 1982). The State contends that since the fourth amendment does not extend its protection to open fields, no search warrant was necessary to enter appellant's land and seize the marihuana from the garden and shed. See *Beasley*, 683 S.W.2d at 133.

■ An "open field" need not be "open" or a "field" as those terms are commonly used. A fenced, thickly wooded area may be an open field for the purpose of fourth amendment analysis. *Oliver*, 466 U.S. at 180 n. 11, 104 S.Ct. at 1742 n. 11. The term may be defined as "any unoccupied or undeveloped area outside the curtilage" of a dwelling. *Id.*

■ The fourth amendment does protect the curtilage of a house, and the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself. See *United States v. Dunn*, 480 U.S. 294, 300, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987). In examining the "extent of the curtilage question, we examine the proximity of the intruded area to the home, the nature of the uses to which the area is put, whether the area is within the home's enclosure, and the steps the resident took to protect the area from observation of passerby." *Id.* at 301, 107 S.Ct. at 1139; *Emiliano v. State*, 840 S.W.2d 102, 104 (Tex.App.—Corpus Christi 1992, pet. ref'd). These "factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment pro-

---

**15.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

tection." *Dunn*, 480 U.S. at 301, 107 S.Ct. at 1139. Applying these factors to appellant's fenced garden and shed near appellant's home on a thirty-five acre tract, we conclude that the garden and shed were within the curtilage of the rural home. It was the State's burden to prove the validity of the warrantless search and seizure, and it has failed to sustain that burden by use of the "open fields doctrine."

In the instant cause, the trial court denied the motion to suppress evidence. Such a ruling following a suppression hearing will not be disturbed absent an abuse of discretion. *Dancy v. State*, 728 S.W.2d 772, 777 (Tex.Crim.App.), *cert. denied*, 484 U.S. 975, 108 S.Ct. 485, 98 L.Ed.2d 484 (1987); *Maddox v. State*, 682 S.W.2d 563, 564 (Tex.Crim. App.1985). In reviewing the trial court's decision, an appellate court does not engage in its own factual review; it determines only whether the record supports the trial court's ruling *and whether the trial court properly applied the law to the facts. Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim.App. 1990). On appeal, the evidence at the suppression hearing is viewed in the light most favorable to the trial court's ruling, keeping mind that the trial court is the judge of the credibility of the witnesses and the weight to be given to their testimony. *See Daniels v. State*, 718 S.W.2d 702, 704 (Tex.Crim.App.), *cert. denied*, 479 U.S. 885, 107 S.Ct. 277, 93 L.Ed.2d 252 (1986), *overruled on other grounds, Juarez*, 758 S.W.2d at 780 n. 3.

With this background, and having jointly discussed appellant's three points of error, we now recapitulate. In point of error two, appellant contends that the trial court erred in refusing to suppress the results of a warrantless search by aerial surveillance form a helicopter in violation of the fourth amendment of the United States Constitution. To reiterate, the initial observation of the marihuana at 350 to 400 feet and the subsequent overflight at 100 feet to make a positive identification of the substance and to take photographs was not a search under the fourth amendment in light of the *Riley* decision. Point of error two is overruled.

■ The first point of error advances the same contention as the second point but

claims a violation of article I, section 9, of the Texas Constitution. Appellant cites *Heitman v. State*, 815 S.W.2d 681 (Tex.Crim.App. 1991). He relies solely, however, upon the *Riley* decision that deals only with the fourth amendment. Federal and state constitutional claims should be argued in separate points of error with separate substantive analysis or argument provided for each ground. *Muniz v. State*, 851 S.W.2d 238, 251–52 (Tex.Crim. App.), *cert. denied*, —— U.S. ——, 114 S.Ct. 116, 126 L.Ed.2d 82 (1993); *Heitman*, 815 S.W.2d at 690–91 n. 23; *Morehead v. State*, 807 S.W.2d 577, 579 n. 1 (Tex.Crim.App. 1991). Appellant has provided no argument or authority regarding the protection afforded by article I, section 9, of the state constitution. The point is inadequately briefed. Tex.R.App.P. 74(f); *Robinson v. State*, 851 S.W.2d 216, 222 n. 4 (Tex.Crim.App.1991). "We will not make appellant's state constitutional argument for him." *Muniz*, 851 S.W.2d at 252. Appellant has not shown under the circumstances, that article I, section 9, of the state constitution offers greater protection than the fourth amendment. Point of error two is overruled.

In the third point of error, appellant contends that the trial court erred in refusing to suppress the fruits of the warrantless intrusion and seizure *after* the marihuana had been observed by aerial surveillance. We agree. The State failed to sustain its burden of showing that the warrantless intrusion and seizure was valid either by reliance on the "open fields" doctrine or upon continuing exigent circumstances, and it failed to establish by clear and convincing proof that the consent to search was freely and voluntarily given. The consent was invalid as a matter of law. The third point of error is sustained.

The order denying the motion to suppress was erroneously entered. The judgment of conviction is reversed and the cause is remanded.