[Cite as *State v. Jordan*, 2022-Ohio-1992.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLANT,            CASE NO. 14-21-21

      v.

SETH JORDAN,                        **O P I N I O N**

      DEFENDANT-APPELLEE.

Appeal from Union County Common Pleas Court
Trial Court No. 21-CR-0100

Judgment Reversed and Cause Remanded

Date of Decision:   June 13, 2022

APPEARANCES:

    *Andrew M. Bigler* for Appellant

    *Robert J. Beck, Jr.* for Appellee

**MILLER, J.**

{¶1} Plaintiff-appellant, the State of Ohio, appeals the October 14, 2021 judgment of the Union County Court of Common Pleas granting defendant-appellee, Seth Jordan's, motion to suppress evidence of suspected marijuana being grown on his property near his home. For the reasons that follow, we reverse.

### I. Facts & Procedural History

{¶2} On September 8, 2020, law enforcement officers from the Union County Sheriff's Department and the Ohio Bureau of Criminal Investigation participated in a countywide marijuana eradication operation. The operation involved a police helicopter and a trained spotter who would look for marijuana plants from his position in the helicopter. Whenever the spotter located a suspected marijuana grow on the ground below, ground-based officers would respond to the helicopter's location and remove the suspected marijuana.

{¶3} As the eradication operation moved throughout Union County, the police helicopter eventually came to Jordan's rural property in Richwood, Ohio. From his position in the airspace above Jordan's property, the spotter observed what he suspected to be marijuana plants growing near Jordan's residence. The ground-based officers were notified of the spotter's sighting and they responded in force. On their arrival at Jordan's property, the ground-based officers encountered Jordan's girlfriend, Patricia Ralstad, and told her that marijuana had been observed

growing on Jordan's property. The officers then obtained Ralstad's written consent to search the property. In all, eight suspected marijuana plants were seized from the area immediately surrounding Jordan's residence.

{¶4} On May 28, 2021, the Union County Grand Jury returned an indictment charging Jordan with one count of illegal cultivation of marihuana in violation of R.C. 2925.04(A), a third-degree felony, and one count of possession of marihuana in violation of R.C. 2925.11(A), a third-degree felony. On June 23, 2021, Jordan appeared for arraignment and pleaded not guilty to the counts of the indictment.

{¶5} On September 1, 2021, Jordan was granted leave to file a motion to suppress evidence. Jordan then filed his suppression motion on September 7, 2021. In his motion, Jordan sought to exclude all evidence obtained through the search of his property and the subsequent investigation. He argued that the warrantless observation of the curtilage of his home from the police helicopter constituted an unreasonable search that violated his rights under the Fourth Amendment to the United States Constitution. Although Jordan acknowledged that Ralstad had consented to the search of his property that ultimately led to the seizure of the suspected marijuana plants, he maintained that Ralstad's consent was constitutionally invalid because of its temporal proximity to the illegal aerial observation and the arrival of the ground-based officers.

Case No. 14-21-21

{¶6} A suppression hearing was held on October 5, 2021. On October 14, 2021, the trial court granted Jordan's suppression motion. At the heart of the trial court's ruling was the following brief analysis:

> From the exhibits and testimony, the Court finds [Jordan] had a reasonable expectation of privacy. His home was located well off the road. No passer-by could view the plants growing in the curtilage of the property. The Court finds from the testimony that the helicopter was extremely low. From the testimony, it appeared to be less than 300 feet. But for this violation of [Jordan's] reasonable expectation of privacy, the subsequent investigation would not have occurred.

(Doc. No. 21). Consequently, the trial court suppressed the suspected marijuana seized from Jordan's property. In doing so, the trial court did not consider the validity of Ralstad's consent, instead erroneously indicating in its judgment entry that the "defense chose not to pursue the voluntariness of the Consent to Search."

**II. Assignments of Error**

{¶7} On October 15, 2021, the State timely filed a notice of appeal and a certification pursuant to Crim.R. 12(K). It raises the following three assignments of error for our review:

> **1. The trial court erred by not requiring appellee prove he had a reasonable expectation of privacy in the airspace above his house before requiring the State to justify the search.**
>
> **2. The trial court erred in finding a violation of appellee's Fourth Amendment right against unreasonable searches and seizures.**

-4-

**3. Even if there was a Fourth Amendment violation, the trial court erred in applying the exclusionary rule to the evidence obtained.**

For ease of discussion, we consider the State's first and second assignments of error together, followed by its third assignment of error.

### III. Discussion

**A. First & Second Assignments of Error: Did Jordan have the burden of proving that he had a legitimate expectation of privacy and did the trial court err by granting Jordan's motion to suppress evidence?**

{¶8} In its first and second assignments of error, the State argues that the trial court committed various errors in granting Jordan's suppression motion. In its first assignment of error, the State maintains the trial court erred by failing to place the burden on Jordan to prove he had a reasonable expectation of privacy that was invaded by the aerial surveillance of his property. In its second assignment of error, the State contends the trial court erred by granting Jordan's suppression motion because the aerial surveillance of Jordan's property did not violate the Fourth Amendment. Specifically, the State argues that based on the evidence introduced at the suppression hearing, Jordan could not have reasonably expected that the curtilage of his property would be shielded from aerial observation. Therefore, the State claims, the aerial surveillance did not constitute a "search" within the meaning of the Fourth Amendment.

### i. Standard of Review

{¶9} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id. See State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must independently determine whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

### ii. The Fourth Amendment & Aerial Surveillance

{¶10} The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

"The Fourth Amendment proscribes all unreasonable searches * * *." *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408 (1978). "[T]he text of the Fourth Amendment does not specify when a search warrant must be obtained * * *."

*Kentucky v. King*, 563 U.S. 452, 459, 131 S.Ct. 1849 (2011). However, "it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Mincey* at 390, quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507 (1967).

{¶11} "[W]hen it comes to the Fourth Amendment, the home is first among equals," and at its "'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Florida v. Jardines*, 569 U.S. 1, 6, 133 S.Ct. 1409 (2013), quoting *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679 (1961). The curtilage of a home, defined as the area "'immediately surrounding and associated with the home,'" is "'part of the home itself for Fourth Amendment purposes.'" *Id.*, quoting *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735 (1984). "The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." *California v. Ciraolo*, 476 U.S. 207, 212-213, 106 S.Ct. 1809 (1986). Therefore, as a general matter, it is presumptively unreasonable for the government to conduct a search of a home or its curtilage without a warrant. *United States v. Perea-Rey*, 680 F.3d 1179, 1184 (9th Cir.2012).

**{¶12}** But a "search" within the meaning of the Fourth Amendment does not necessarily occur whenever a government actor obtains information by visually surveilling a home or its curtilage. Instead, in many such cases, "[w]hether a search has occurred for Fourth Amendment purposes depends upon whether the person invoking the Fourth Amendment's protections can claim a '"legitimate expectation of privacy"' that has been infringed by government action."[1] *State v. Eads*, 1st Dist. Hamilton Nos. C-190213, C-190214 and C-190215, 2020-Ohio-2805, ¶ 12, quoting *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577 (1979). "This inquiry turns on whether an individual has a subjective expectation of privacy and whether that expectation is one that society recognizes as reasonable." *Id.*, citing *Katz* at 351. As a result, "a Fourth Amendment search does *not* occur—even when the explicitly protected location of a *house* is concerned—unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'" (Emphasis sic.) *Kyllo v. United States*, 533 U.S. 27, 33, 121 S.Ct. 2038 (2001), quoting *Ciraolo* at 211.

**{¶13}** "Courts applying the subjective expectation prong have looked to the individuals' affirmative steps to conceal and keep private whatever item was the

---

[1] In other cases, a "search" might be found if a government actor "physically occupied private property for the purpose of obtaining information." *United States v. Jones*, 565 U.S. 400, 404-405, 132 S.Ct. 945 (2012). The reasonable-expectation-of-privacy test detailed in this section "has been *added to*, not *substituted for*, the common-law trespassory test." (Emphasis sic.) *Id.* at 409.

subject of the search." *United States v. Yang*, 478 F.3d 832, 835 (7th Cir.2007). "[A]n individual claiming a subjective expectation of privacy must exhibit that expectation, i.e., he or she must not have manifested by his or her conduct a voluntary consent to the * * * allegedly invasive actions." *Id.* By contrast, when assessing whether an individual's expectation of privacy is reasonable, "'[t]he test * * * is not whether the individual chooses to conceal assertedly "private" activity,' but instead 'whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment.'" *Ciraolo* at 212, quoting *Oliver* at 181-183.

{¶14} On two previous occasions, the Supreme Court of the United States has applied the reasonable-expectation-of-privacy test to aerial surveillance of the curtilage of a private residence. In the first of these cases, *California v. Ciraolo*, law enforcement officers received a tip that marijuana was growing in Ciraolo's backyard, which was shielded from view at ground level by two fences. *Ciraolo*, 476 U.S. at 209. The officers secured a private plane and flew over Ciraolo's property, where, at an altitude of 1,000 feet, marijuana was observed growing in a garden plot in the yard. *Id.* On the basis of the naked-eye observation, a search warrant was obtained and marijuana plants were seized from Ciraolo's property. *Id.* at 209-210. From these facts, the Supreme Court accepted that the marijuana was

observed in the curtilage of Ciraolo's home and acknowledged Ciraolo's heightened

expectations of privacy in his yard, but nevertheless observed:

> That [an] area is within the curtilage does not itself bar all police observation. The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible. * * * "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."

*Id.* at 211-213, quoting *Katz*, 389 U.S. at 351. The court found that the marijuana

was observed from a position "within public navigable airspace * * * in a physically

nonintrusive manner" and that "[a]ny member of the public flying in this airspace

who glanced down could have seen everything that [the] officers observed." *Id.* at

213-214. Accordingly, the court concluded that the aerial observation from an

altitude of 1,000 feet did not violate the Fourth Amendment because, "[i]n an age

where private and commercial flight in the public airways is routine," Ciraolo's

"expectation that his garden was protected from such observation is unreasonable

and is not an expectation that society is prepared to honor." *Id.* at 214-215.

{¶15} The Supreme Court returned to the issue of aerial surveillance in

*Florida v. Riley*, which involved aerial surveillance from a much lower altitude. In

*Riley*, law enforcement officers received an anonymous tip that marijuana was being

grown on Riley's five-acre rural property. *Florida v. Riley*, 488 U.S. 445, 448, 109

S.Ct. 693 (1989). When investigators went to Riley's property, they found that much of the property could not be observed from ground level. As the court described:

> A greenhouse was located 10 to 20 feet behind [Riley's] mobile home. Two sides of the greenhouse were enclosed. The other two sides were not enclosed but the contents of the greenhouse were obscured from view from surrounding property by trees, shrubs, and the mobile home. The greenhouse was covered by corrugated roofing panels, some translucent and some opaque. * * * [T]wo of the panels, amounting to approximately 10% of the roof area, were missing. A wire fence surrounded the mobile home and the greenhouse, and the property was posted with a "DO NOT ENTER" sign.

*Id.* Undeterred, an investigating officer secured a helicopter and flew over Riley's property at a height of 400 feet. *Id.* With his naked eye, the officer was able to see through the openings in the greenhouse and identify what he believed to be marijuana. *Id.* Based on these observations, a search warrant was secured, and marijuana was located during the ensuing search of the greenhouse. *Id.* at 448-449.

{¶16} A four-Justice plurality of the court concluded that the aerial observation of Riley's greenhouse did not violate the Fourth Amendment. The plurality found that, as in *Ciraolo*, the property surveyed was within the curtilage of Riley's home and that Riley had manifested a subjective expectation of privacy in the greenhouse. *Id.* at 450. Yet, the plurality concluded, Riley's expectation of privacy was not reasonable because "[a]ny member of the public could legally have been flying over [his] property in a helicopter at the altitude of 400 feet and could

have observed Riley's greenhouse." *Id.* at 451. Although the plurality observed that it would have been "a different case if flying at that altitude had been contrary to law or regulation," it cited Federal Aviation Administration ("FAA") regulations that allow helicopters to operate at almost any altitude provided that the operation is conducted "without hazard to persons or property on the surface" and in compliance with routes or altitudes specifically prescribed for helicopters by the FAA. *Id.* at 451 and 451, fn. 3; *see* 14 C.F.R. 91.119(d)(1). While cautioning that the observation of the curtilage of a home from an aircraft might not "always pass muster under the Fourth Amendment simply because the [aircraft] is within the navigable airspace specified by law," the plurality stated that it was "obvious[ly] importan[t] that the helicopter [flying over Riley's property] was *not* violating the law * * *." (Emphasis sic.) *Id.* at 451. Furthermore, the plurality found "nothing in the record or before [the court] to suggest that helicopters flying at 400 feet are sufficiently rare in this country to lend substance to [Riley's] claim that he reasonably anticipated that his greenhouse would not be subject to observation from that altitude." *Id.* at 451-452. Finally, the plurality found it significant that there was no evidence that the helicopter interfered with Riley's normal use of his property by exposing the "intimate details connected with the use of the home or curtilage" to observation, causing "undue noise," creating a threat of injury, or kicking up wind or dust. *Id.* at 452.

{¶17} In a separate concurrence, Justice O'Connor agreed with the plurality that the aerial surveillance of Riley's property did not violate the Fourth Amendment. However, Justice O'Connor believed that the plurality's analysis rested "too heavily on compliance with FAA regulations whose purpose is to promote air safety," not to safeguard the rights protected by the Fourth Amendment. *Id.* at 452 (O'Connor, J., concurring). In Justice O'Connor's view, the relevant inquiry in determining whether Riley had a reasonable expectation of privacy was not "whether the helicopter was where it had a right to be under FAA regulations." *Id.* at 454 (O'Connor, J., concurring). Instead, the court should have asked "whether the helicopter was in the public airways at an altitude at which members of the public travel with sufficient regularity that Riley's expectation of privacy from aerial observation was not 'one that society is prepared to recognize as "reasonable."'" *Id.*, quoting *Katz*, 389 U.S. at 361. Justice O'Connor ultimately concluded that there was no Fourth Amendment violation because "the defendant must bear the burden of proving that his expectation of privacy was a reasonable one, and thus that a 'search' within the meaning of the Fourth Amendment even took place," and Riley had not introduced evidence demonstrating that the public rarely occupied airspace at an altitude of 400 feet as to support a reasonable expectation of privacy. *Id.* at 455 (O'Connor, J., concurring).

**iii. In this particular case, Jordan bore the burden of proving at the suppression hearing that he had a legitimate expectation of privacy as against the helicopter surveillance and that the surveillance was thus a "search."**

{¶18} In its first assignment of error, the State takes issue with the trial court's allocation of the burden of proof in this case. At the beginning of the suppression hearing, the State, seizing on Justice O'Connor's concurrence in *Riley*, argued that Jordan had the burden of proving that he had a reasonable expectation of privacy and, accordingly, that there was even a "search" within the meaning of the Fourth Amendment. (Oct. 5, 2021 Tr. at 5). The State maintained that Jordan had not "presented any allegations in [his] motion * * * [or] any evidence in a statement of facts that would establish that he had a reasonable expectation of privacy in the location of the helicopter regardless of where it was." (Oct. 5, 2021 Tr. at 5). The State insisted that Jordan had not "met his burden" and that "if he were to present evidence, * * * it would be his burden to go first before the State was obligated to justify its search." (Oct. 5, 2021 Tr. at 5). Without addressing whether a search occurred, the trial court required the State to proceed first, stating that "if it is a warrantless search, the State [generally] has the burden of going forward." (Oct. 5, 2021 Tr. at 4, 6-7). At the end of the hearing, the State renewed its "objection that [Jordan] did not prove that there was an expectation of privacy where the helicopter was located." (Oct. 5, 2021 Tr. at 88).

{¶19} In its judgment entry granting Jordan's suppression motion, the trial court acknowledged the State's position that Jordan had the burden of showing that he had a reasonable expectation of privacy. However, the trial court stated that "[n]otwithstanding Justice O'Connor's dicta about [the] burden of proof on the defendant, the Court follows precedent that once the defendant specifies the grounds [for his suppression motion], the State has the burden by a preponderance of the evidence to show the reasonableness of a warrantless search." The trial court found "the State ha[d] failed to do so in this case" and consequently granted Jordan's suppression motion.

{¶20} Insofar as the trial court described the law as it is customarily applied to suppression motions and suppression hearings, the trial court's observations were accurate. Generally, "[t]o suppress evidence obtained pursuant to a warrantless search or seizure, the defendant must (1) demonstrate the lack of a warrant, and (2) raise the grounds upon which the validity of the search or seizure is challenged in such a manner as to give the prosecutor notice of the basis for the challenge." *Xenia v. Wallace*, 37 Ohio St.3d 216 (1988), paragraph one of the syllabus. "Once a defendant has demonstrated a warrantless search or seizure and adequately clarified that the ground upon which he challenges its legality is lack of probable cause, the prosecutor bears the burden of proof, including the burden of going forward with

evidence, on the issue of whether probable cause existed for the search or seizure." *Id.* at paragraph two of the syllabus.

**{¶21}** In applying these principles, at least one court has suggested that if (1) a defendant's suppression motion sets forth sufficiently particularized allegations such that, from the face of the motion, it appears that the defendant was the subject of a warrantless search or seizure and (2) the defendant clearly specifies the legal basis for their motion (e.g., no probable cause, no exception to the warrant requirement), the State's failure to present evidence at the suppression hearing, where it has the burden of proof from the outset, requires that the defendant's motion be granted. *See State v. Williams*, 7th Dist. Harrison No. 19 HA 0005, 2019-Ohio-5064, ¶ 16-22; *but see State v. Newell*, 1st Dist. Hamilton Nos. C-160453, C-160454, C-160455 and C-160456, 2017-Ohio-4143, ¶ 4-7, 18 (where the State asserted the burden of production to establish a warrantless search was on the defendant and the State did not present evidence at the suppression hearing, the trial court's decision granting the defendant's suppression motion was reversed because the defendant "failed to discharge her initial burden of production to show that her seizure was warrantless," thus never shifting the burden of proof to the State).

**{¶22}** In many cases, it is plain from the defendant's suppression motion that the governmental action described therein constitutes a warrantless "search" or "seizure" within the meaning of the Fourth Amendment. Oftentimes, the

prosecution stipulates there was a warrantless "search" or "seizure." In instances where the existence of a Fourth Amendment "search" or "seizure" is not disputed, or where the applicability of the Fourth Amendment is conceded, these procedures make sense. In such cases, instead of requiring the defendant to first put on evidence that a "search" or "seizure" actually occurred as described in the suppression motion, it is simply more efficient to proceed directly to the presentation of evidence bearing on whether the government's actions pass muster under the Fourth Amendment. The witnesses the defendant would usually need to call to make such a showing, i.e., the arresting or investigating law enforcement officers, are persons to whom the State has "primary access" and whom the State itself would be expected to call to sustain its burden of proving the reasonableness of the governmental action at issue. *Wallace* at 219-220. Requiring the defendant to proceed first with evidence at the suppression hearing would be nothing more than "time-consuming ceremony accomplish[ing] little except to delay the point at which the facts actually bearing upon the legality of the [challenged governmental action] are produced by the prosecution * * *." 6 Wayne R. LaFave, *Search and Seizure*, Section 11.2(b) (6th Ed.); *see State v. Wintermeyer*, 158 Ohio St.3d 513, 2019-Ohio-5156, ¶ 23 ("Limiting suppression hearings to issues that are actually contested promotes judicial economy by ensuring that parties do not put on unnecessary evidence and that trial courts do not consider extraneous issues.").

**{¶23}** However, these procedures are less well adapted to cases, like the instant case, where a material, disputed issue is whether the Fourth Amendment is even implicated by the challenged governmental action. Where the court is called upon to make a threshold determination whether a "search" within the meaning of the Fourth Amendment even occurred, requiring the State to proceed first at the suppression hearing, with the burden of ultimately proving the reasonableness of the challenged governmental action, places the State in the odd position of having to produce evidence that its action was justified under a constitutional rule by which it might not have been restrained. The State might seek to discharge its burden by producing evidence demonstrating that there was no "search" within the meaning of the Fourth Amendment, but this may be particularly onerous for the State as the existence of a "search" within the meaning of the Fourth Amendment frequently turns on whether the defendant had a reasonable expectation of privacy, something "about which the defendant will be most knowledgeable." 6 LaFave, *Search and Seizure*, at Section 11.2(b). It is certainly more difficult for the State to prove that the defendant lacked a reasonable expectation of privacy than it is for the defendant to prove that he had such an expectation. *See Wallace*, 37 Ohio St.3d at 219-220.

**{¶24}** How then, in cases like the one presently before us, is the trial court to allocate the burden of proof at the suppression hearing? Some jurisdictions are explicit that in "was-there-a-search" cases, "a criminal defendant bears the burden

of establishing both that he manifested a subjective expectation of privacy that was invaded by government action and that that expectation was legitimate." *State v. Rewolinski*, 159 Wis.2d 1, 16 (1990); *see, e.g.*, *United States v. Long*, 797 F.3d 558, 564-566 (8th Cir.2015); *United States v. Cavely*, 318 F.3d 987, 993-994 (10th Cir.2003); *United States v. French*, 291 F.3d 945, 951-955 (7th Cir.2002). Furthermore, although only in Justice O'Connor's concurrence in *Riley* was this burden expressly placed on the criminal defendant, courts and commentators alike have observed that the four-Justice plurality "clearly assumed what Justice O'Connor stated explicitly when it assumed the position of the state by reference to 'the record not suggesting otherwise.'" *Rewolinski* at 15; *see Riley v. State*, 549 So.2d 673, 674 (Fla.1989) (on remand from the Supreme Court's decision in *Riley*, opining that the four-Justice plurality had "implied that Riley had the obligation of supporting his claim[ed]" reasonable expectation of privacy); *Moss v. State*, 878 S.W.2d 632, 641 (Tex.App.1994); 6 LaFave, *Search and Seizure*, at Section 11.2(b), fn. 73.

{¶25} The burden-of-proof principles articulated in these cases exist in similar form in Ohio law, finding their clearest expression in the somewhat different context of Fourth Amendment standing. As the Supreme Court of Ohio has recognized, "to have standing to challenge a search * * *, the defendant must have a reasonable expectation of privacy * * *." *State v. Jackson*, 102 Ohio St.3d 380,

2004-Ohio-3206, ¶ 8. "The defendant bears the burden of demonstrating that he possessed a legitimate expectation of privacy in the object of the search," which requires the defendant to demonstrate both that he had a subjective expectation of privacy and that his expectation was objectively reasonable. *State v. Emerson*, 134 Ohio St.3d 191, 2012-Ohio-5047, ¶ 16-17. However, the defendant is not put to this burden in each and every case. Instead, because Fourth Amendment standing is "an issue that must be established by the defendant *if it is disputed by the state*," the defendant's burden to "demonstrate Fourth Amendment standing is triggered only when the government argues that the defendant lacks a protected privacy interest affected by the search * * *." (Emphasis sic.) *Wintermeyer*, 158 Ohio St.3d 513, 2019-Ohio-5156, at ¶ 13, 17, 20.

{¶26} Considering the foregoing, we conclude that in cases like the one before us—where the State, at the beginning of the suppression hearing, legitimately disputes the very existence of a Fourth Amendment "search" and requests explicitly that the defendant be charged with the burden of proof on the issue—the defendant bears the burden of proving at the suppression hearing that there was a "search" within the meaning of the Fourth Amendment. That is, the defendant must produce sufficient evidence at the suppression hearing to persuade the trial court that he had a subjective expectation of privacy that was invaded by the challenged governmental action and that his expectation of privacy was objectively reasonable.

If the defendant succeeds in establishing that the government performed a Fourth Amendment "search" and that the search was conducted without a warrant, the burden then shifts to the State to show the validity of the warrantless search. *See State v. Malott*, 79 Ohio App.3d 393, 398 (4th Dist.1992). This conclusion accords with *Riley*, is supported by substantial persuasive authority from outside of Ohio, and is consistent with Supreme Court of Ohio precedent.[2]

{¶27} Here, however, the trial court did not recognize that Jordan had the burden of proving at the suppression hearing that the helicopter surveillance constituted a "search" within the meaning of the Fourth Amendment. This was error on the part of the trial court.

### iv. The trial court erred by granting Jordan's suppression motion because Jordan failed to prove that he had an objectively reasonable expectation of privacy that was invaded by the helicopter surveillance.

{¶28} We turn now to the State's second assignment of error, wherein the State argues that the trial court erred by granting Jordan's motion to suppress evidence. In addressing the State's second assignment of error, we are conscious that, notwithstanding the trial court's allocation of the burden of proof at the suppression hearing, Jordan had the burden in this case of proving that he had a legitimate expectation of privacy as against the helicopter surveillance.

---

[2] In so concluding, we decline to prescribe any specific procedure that trial courts must follow in cases such as this case. We leave such matters to the sound discretion of the trial court. *See State v. Malott*, 79 Ohio App.3d 393, 398 (4th Dist.1992). In a given case, the trial court might adopt procedures specially tailored to meet the particular needs of the case.

**{¶29}** To begin, we acknowledge what is not disputed in this appeal. First, the State does not deny, and we do not doubt, that the area observed by the occupants of the police helicopter was within the curtilage of Jordan's property. Consequently, the area observed by the occupants of the police helicopter was, as a general matter, protected under the Fourth Amendment. *See State v. Duvernay*, 3d Dist. Allen No. 1-16-62, 2017-Ohio-4219, ¶ 11, 21 (noting that, subject to certain exceptions, an individual generally has a legitimate expectation of privacy protected by the Fourth Amendment in the curtilage of their home). Furthermore, the State does not claim that Jordan failed to prove that he had a subjective expectation of privacy in the area of his home's curtilage observed by the occupants of the helicopter. Based on the rural character of the environs, the large size of Jordan's property, and the fairly distant location of his house in relation to the nearest road, and giving due deference to the trial court's finding that "[n]o passer-by could view the plants growing in the curtilage of the property," we do not question that Jordan had a subjective expectation of privacy in the curtilage around his home.

**{¶30}** Thus, the only remaining issue, and the issue actually raised by the State, is whether Jordan carried his burden of establishing that his subjective expectation of privacy was objectively reasonable. In assessing the objective reasonableness of Jordan's expectation of privacy, we follow the analysis of *Riley* and focus on the evidence in the record relating to the following: (1) the police

helicopter's compliance with applicable FAA regulations; (2) the altitude at which the helicopter was flying; (3) the frequency or rarity of helicopter flights at that altitude; and (4) the extent to which the helicopter interfered with Jordan's normal use of his home or its curtilage, which involves a consideration of whether the occupants of the helicopter observed "intimate details connected with the use of the home or curtilage" and whether the helicopter created wind, dust, threat of injury, or undue noise. *Riley*, 488 U.S. at 451-452; *Id.* at 454-455 (O'Connor, J., concurring).

**{¶31}** First, there is no indication from the evidence presented at the suppression hearing that the police helicopter was operating in violation of FAA altitude, route, or safety regulations at the time the marijuana was observed in the curtilage of Jordan's home. In the proceedings below, Jordan did not challenge the helicopter's compliance with FAA regulations, and he does not assert such a claim in this appeal. Therefore, on this record, it appears the occupants of the police helicopter viewed the marijuana on Jordan's property from a lawful vantage point.

**{¶32}** Secondly, from the record and from the trial court's judgment entry, it is unclear exactly how high the helicopter was flying when the marijuana was observed.[3] At the suppression hearing, varying testimony was presented concerning the helicopter's altitude. The State's only witness, Detective Seth McDowell of the

---

[3] None of the occupants of the police helicopter, who presumably could have testified to the height at which the helicopter flew, were called to testify at the suppression hearing.

Union County Sheriff's Department, testified that the helicopter was flying above "tree line" level and that, from the ground, he never observed the helicopter ascend or descend from the altitude at which it was flying throughout Union County. (Oct. 5, 2021 Tr. at 13-15, 17, 20, 23). According to Detective McDowell, he observed the helicopter flying at this altitude when he arrived at Jordan's property. (Oct. 5, 2021 Tr. at 15, 23). However, Detective McDowell acknowledged he lost visual contact with the helicopter as it flew toward Jordan's property and that he did not know "what was going on" with the helicopter at the "very moment" the marijuana was spotted. (Oct. 5, 2021 Tr. at 14, 20). One of Jordan's witnesses, his next-door neighbor Megan Respaldo, testified the helicopter "wasn't high up" and that "it was pretty low." (Oct. 5, 2021 Tr. at 36). She stated the helicopter had flown "right over" certain trees on or near Jordan's property and, using these trees as a reference point, estimated that the helicopter was hovering approximately 60 feet above the ground. (Oct. 5, 2021 Tr. at 40, 44). But on cross-examination, Respaldo testified that the horizontal distance between Jordan's house and a stand of trees behind the house, a space of 250-300 feet, was approximately equal to the height at which the helicopter was flying over Jordan's property. (Oct. 5, 2021 Tr. at 48-51). Finally, Jordan elicited testimony from Ralstad, who stated that the helicopter was flying "super low." (Oct. 5, 2021 Tr. at 70). In Ralstad's estimation, the helicopter was flying "higher than [the] roof," but no more than two times the height of Jordan's

house and low enough that someone could have "jumped out of the helicopter onto the ground" or hit the helicopter with a baseball with "maybe two" throws. (Oct. 5, 2021 Tr. at 71-73).

{¶33} In its judgment entry, the trial court noted the conflict in the evidence concerning the police helicopter's altitude. Nevertheless, it did not clearly resolve this conflict. Rather than finding that the helicopter was flying at or below 60 feet or that the helicopter was hovering 250-300 feet off the ground, either of which would have been supported by the evidence presented at the suppression hearing, the trial court found only that the helicopter was "extremely low" and that "it appeared to be less than 300 feet." Although these fairly equivocal findings are supported by evidence in the record, they are not dispositive of whether Jordan had an objectively reasonable expectation of privacy. The fact that a police helicopter was operated at or below 300 feet does not alone support a conclusion that the defendant had an objectively reasonable expectation of privacy that was invaded by the government's aerial surveillance. *See United States v. Warford*, 439 F.3d 836, 843-844 (8th Cir.2006) (concluding that aerial surveillance from a helicopter hovering 200-300 feet above the ground did not constitute a "search" under the Fourth Amendment); *United States v. Breza*, 308 F.3d 430, 433-435 (4th Cir.2002) (concluding that aerial observation from a helicopter flying at an altitude as low as 200 feet did not violate the Fourth Amendment); *United States v. Eight Firearms*,

881 F.Supp. 1074, 1078 (S.D.W.Va.1995) ("It is equally clear from the case law that a helicopter conducting aerial surveillance of marihuana growing in the claimant's backyard at an altitude as low as 100 feet is not violative of his Fourth Amendment rights.").

{¶34} With respect to the next consideration—the frequency or rarity of air travel at the altitude flown by the helicopter in this case—we conclude that, whatever the helicopter's exact altitude, Jordan failed to establish that flights below 300 feet are "so rare as to make aerial surveillance at that level unreasonable." *United States v. Boyster*, 436 F.3d 986, 992 (8th Cir.2006). In reaching this conclusion, we acknowledge that Respaldo and Ralstad both testified at the suppression hearing that they had never before observed an aircraft flying that low over the area surrounding Jordan's house. (Oct. 5, 2021 Tr. at 45, 75). However, in *Riley*, both the four-Justice plurality and Justice O'Connor appeared to frame the inquiry in terms of the general frequency of public use of airspace at a particular altitude, not the regularity of air traffic at that altitude over the defendant's property specifically. *See Riley*, 488 U.S. at 451 ("[T]here is nothing in the record or before us to suggest that helicopters flying at 400 feet are sufficiently rare *in this country* * * *.") (Emphasis added.); *Id.* at 455 (O'Connor, J., concurring) ("[I]f the public can *generally be expected to travel over residential backyards* at an altitude of 400 feet, Riley cannot reasonably expect his curtilage to be free from such aerial

observation.") (Emphasis added.). Even if fully credited, Respaldo's and Ralstad's testimonies concern only the frequency of low-altitude air travel over their residences and are thus of scant value in answering the relevant question of how regularly the general public can be expected to travel over residential backyards at the altitude flown by the police helicopter in this case.

{¶35} Lastly, while testimony elicited by Jordan at the suppression hearing showed that the police helicopter caused some ground-level disruptions at and around Jordan's property, these disruptions appear to have been relatively minor and of short duration. On this point, the trial court's judgment entry includes only a few relevant findings of fact. Specifically, the trial court noted little more from Respaldo's testimony than "it sounded like a war" outside and that the helicopter "would wake someone up." (*See* Oct. 5, 2021 Tr. at 37). However, in addition to the testimony referenced by the trial court in its journal entry, Respaldo testified that the helicopter caused her animals to "freak out," that her children were scared, that she did not leave her house, and that she would not have felt comfortable taking her children into her backyard while the helicopter was flying overhead. (Oct. 5, 2021 Tr. at 38, 42-43, 45). She further stated that her walls were shaking "not like extreme, but * * * a little bit." (Oct. 5, 2021 Tr. at 37).

{¶36} Ralstad's testimony was similar to Respaldo's insofar as Ralstad testified that the helicopter was "pretty loud," that she did not go into Jordan's

backyard while the helicopter was circling above, and that she would not have felt comfortable using Jordan's backyard with the helicopter flying at that height. (Oct. 5, 2021 Tr. at 69, 73-75). Importantly, Ralstad also said that the noise from the helicopter did "[n]ot really" reverberate or cause any changes in Jordan's house and that while she "felt the vibration, * * * nothing moved." (Oct. 5, 2021 Tr. at 69). Similarly, Respaldo testified that she did not "notice any dust or anything being kicked up from the helicopter blades." (Oct. 5, 2021 Tr. at 42). Ralstad confirmed that the helicopter did not "move any trees or debris" and that it did not "affect [Jordan's] yard in any way." (Oct. 5, 2021 Tr. at 74).

{¶37} Accepting Respaldo's and Ralstad's testimonies as true, there is no indication that the police helicopter interfered significantly with Jordan's normal use of his property. There is no evidence in the record suggesting that the occupants of the helicopter observed any intimate details connected with Jordan's use of his home or curtilage. Furthermore, although Respaldo's and Ralstad's testimonies establish that the helicopter caused loud noise, their testimonies also demonstrate that the helicopter was operated in a way that did not imperil the safety of those on the ground below. The helicopter caused negligible vibration inside of Respaldo's home and Jordan's home, and it did not destroy any property, throw around debris, or kick up dust.

{¶38} In summary, it was Jordan's burden to prove that he had an objectively reasonable expectation that the curtilage of his home would be protected from observation by aircraft traveling at the altitude at which the police helicopter was flying in this case. There is nothing in the record to show that the helicopter was not in compliance with relevant FAA regulations or that the occupants of the helicopter observed the curtilage of Jordan's home from an unlawful vantage point. Although these facts do not alone validate the aerial surveillance, Jordan failed to produce evidence showing that the general public rarely uses airspace at the altitude flown by the helicopter in this case. In addition, the evidence introduced by Jordan at the suppression hearing showed that, at most, the helicopter interfered minimally with the normal use of his property. Therefore, considering all of these factors together, we conclude that Jordan did not carry his burden of proving that he had an objectively reasonable expectation of privacy as against the aerial surveillance in this case. Consequently, because Jordan failed to prove that the aerial surveillance in this case was even a "search" within the meaning of the Fourth Amendment, the trial court erred by granting Jordan's motion to suppress evidence.[4]

{¶39} The State's first and second assignments of error are sustained.

**B.  Third Assignment of Error:  Did the trial court err by applying the exclusionary rule in this case?**

---

[4] As noted earlier, the trial court did not address Jordan's claim that Ralstad's consent to the search of his property was invalid. We express no opinion on that issue.

**{¶40}** In its third assignment of error, the State argues that if the trial court properly determined that the aerial surveillance of Jordan's property violated the Fourth Amendment, it nevertheless erred in applying the exclusionary rule to suppress the marijuana seized from Jordan's property.  However, having concluded that the aerial surveillance of Jordan's property did not run afoul of the Fourth Amendment, the State's third assignment of error has been rendered moot, and we will not address it.  App.R. 12(A)(1)(c); *see State v. Gideon*, 165 Ohio St.3d 156, 2020-Ohio-6961, ¶ 26 ("[A]n assignment of error is moot when an appellant presents issues that are no longer live as a result of some other decision rendered by the appellate court.").

## IV.  Conclusion

**{¶41}** For the foregoing reasons, the State's first and second assignments of error are sustained.  Having found error prejudicial to the appellant herein in the particulars assigned and argued, we reverse the judgment of the Union County Court of Common Pleas and remand for further proceedings consistent with this opinion.

*Judgment Reversed and*
*Cause Remanded*

**ZIMMERMAN, P.J. and SHAW, J., concur.**

**/jlr**